IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

LUIS RODRIGUEZ RAMOS, et al.,

    Plaintiff,

    v.

DEPARTMENT OF EDUCATION, et al.,

    Defendants.

CIVIL NO. 11-1653 (CVR)

## OPINION AND ORDER

## INTRODUCTION

The present case is yet another in a long line of cases that swamp the federal docket every four (4) years following gubernatorial elections held in Puerto Rico, where the incumbent party is defeated. Plaintiffs are four (4) career employees of the Puerto Rico Department of Education, Josefina Arroyo Saurí ("Arroyo"), Luis Rodríguez Ramos ("Rodríguez")[1], Juan Del Valle Meléndez ("Del Valle") and Carmen Rosa García[2] ("Rosa"). They claim violations to the First Amendment, to the due process and equal protection clauses of the Fourteenth Amendment, as well as a sprinkling of state law violations. At this stage, the remaining Defendants in the case are Jesús Rivera Sánchez ("Rivera"), former Secretary of Education, and Sonia Dalila Román ("Román"), one of his aides[3]. Plaintiffs

---

[1] The Complaint was also filed on behalf of Rodríguez' wife, Diana M. Ocasio, and their conjugal partnership. No allegations have been made in the dispositive motions regarding Mrs. Ocasio. For purposes of this Opinion, and for the sake of clarity, the Court refers to them both as "Rodríguez".

[2] This particular Plaintiff was referred to as "Carmen Rosa **Martínez**" in the case caption, yet the text of the Complaint and the motions all refer to her as "Carmen Rosa **García**". The official documents from the Department of Education also refer to her as "Carmen Rosa **García**".

[3] In Plaintiffs' Opposition to Defendants' statement of uncontested facts (Docket No. 137), Plaintiffs state that they had moved to dismiss all claims against co-defendant Carmen Cepeda Ramos, since the person she had supervised had moved for voluntary dismissal. The Court can find no record of this petition for dismissal in the docket, but will rely on this statement and will not address claims against this co-Defendant.

claim these Defendants, members of the New Progressive Party ("NPP"), subjected them to short of dismissal demotions and inferior working conditions, all on the basis of their political affiliation to the Popular Democratic Party ("PDP").

In November of 2008, Gubernatorial candidate Luis Fortuño of the NPP won the election over incumbent Aníbal Acevedo Vilá of the PDP. Due to the dire financial situation the island's economy was in, Governor Fortuño implemented a series of measures, as applied to this case, Law 7, which was geared at reducing government spending and stabilizing finances. Law 7 was passed on March 9, 2009 and amongst its cost-reducing measures, it contained an island-wide layoff plan. Pursuant to the directives of Law 7, the Fiscal Restructuring and Stabilization ("JREF") was created, which was entrusted, among others, with ensuring agency compliance with Law 7 regarding the layoff plan.

At that time, the Department of Education had a budget deficit, yet there were over three (300) hundred available school directors positions, and the government was not going to assign any additional budget to the Department of Education to fill these positions with transitory employees. Since the Secretary of Education had the authority to appoint/transfer/relocate employees due to service needs, a decision was made to send employees on administrative leave ("destaque administrativo") as school directors for one year with the same salary they held for their previous positions, which would thus solve the problem of the vacancies and also avoid any budgetary impact on the department's payroll.

In the meantime, the JREF determined that, effective November 6, 2009, public employees that as of April 17, 2009, had thirteen (13) years six (6) months and zero (0) days of service or less would be affected by the layoffs. Since they would still have the problem

of school director vacancies for the upcoming year, the Department of Education then carried out an internal analysis of what staff within the Department of Education complied with the requirements to become school directors and finally identified some thirty-eight (38) employees who did not have the required time and would be affected by Law 7. Two (2) of the Plaintiffs in the present case, Rodríguez and Del Valle, fell into this category. In order not to be affected by the layoffs, they would have to "accept" a demotion to that position voluntarily, which would ensure their continued employment after the detail ended. Those who accepted the proposal had to submit a letter requesting the demotion to the JREF. Both Rodríguez and Del Valle submitted their letters in October, 2009.

By the following June, 2010, the administrative detail had ended, and an agreement had been reached with the Federal Department of Education to establish a new structure that consolidated the school districts and reduced them from eighty-nine (89) to twenty-eight (28), with the objective of strengthening the student's academic achievements. By that time, Carlos Chardón was no longer Secretary of Education and co-Defendant Rivera had already been appointed Acting Secretary of Education[4]. Rivera began the implementation of the Department's restructuring, which resulted in the consolidation of several districts, the elimination of some, and the consolidation of other positions. The reorganization was implemented across the island. As a result of this, the employees who had been on administrative leave were now reinstated to their previous positions or a similar position. In the case at bar, Plaintiffs Rosa and Arroyo were reinstated to their

---

[4] Odette Piñeiro ("Piñeiro") was appointed Secretary of Education after Carlos Chardón, but her tenure lasted only a few months.

previous positions as Auxiliary Superintendents.  Plaintiffs Rodríguez and Del Valle were reinstated as School Directors, per the "demotion" letter they had signed in October, 2009. Plaintiffs take issue with the administrative detail, as well as to their reinstatements and other actions, alleging they were charged with political animus as they were members of the PDP.

Before the Court now is Defendants' Motion for Summary Judgment (Docket No. 121), Plaintiff's opposition thereto (Docket No. 130), and Defendants' Reply to Plaintiff's opposition (Docket No. 144).  Defendants urge dismissal of all claims brought against them on the following grounds: 1) time bar;  2) lack of a causal connection between Defendants' acts and Plaintiffs' circumstances; 3) failure to show political affiliation as a substantial or motivating factor in the decision-making process; 4) the equal protection and due process claims cannot lie; and 6) Defendants are entitled to qualified immunity.

Plaintiffs in turn posit their claims are not time-barred because the continuing violation doctrine applies; they have established a *prima facie* case of political discrimination; their due process rights were violated, as no pre-termination hearing was held for two (2) Plaintiffs and Defendants' actions shock the conscience; and qualified immunity should be denied.

For the reasons explained herein, Defendants' Motion for Summary Judgment is GRANTED.

## STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there

is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Pursuant to the language of the rule, the moving party bears the two-fold burden of showing that there is "no genuine issue as to any material facts," and that he is "entitled to judgment as a matter of law." Vega-Rodríguez v. Puerto Rico Tel. Co., 110 F.3d 174, 178 (1st Cir. 1997).

After the moving party has satisfied this burden, the onus shifts to the resisting party to show that there still exists "a trial worthy issue as to some material fact." Cortés-Irizarry v. Corporación Insular, 111 F.3d 184, 187 (1st Cir. 1997). A fact is deemed "material" if it potentially could affect the outcome of the suit. Id. Moreover, there will only be a "genuine" or "trial worthy" issue as to such a "material fact," "if a reasonable fact-finder, examining the evidence and drawing all reasonable inferences helpful to the party resisting summary judgment, could resolve the dispute in that party's favor." Id

At all times during the consideration of a motion for summary judgment, the Court must examine the entire record "in the light most flattering to the non-movant and indulge all reasonable inferences in the party's favor." Maldonado-Denis v. Castillo-Rodríguez, 23 F.3d 576, 581 (1st Cir. 1994). There is "no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails, [and] no room for the judge to superimpose his own ideas of probability and likelihood . . . ." Greenburg v. Puerto Rico Mar. Shipping Auth., 835 F.2d 932, 936 (1st Cir. 1987). In fact, "[o]nly if the record, viewed in [this] manner and without regard to credibility determinations, reveals no genuine issue as to any material fact may the court enter summary judgment." Cadle Co. v. Hayes, 116 F.3d 957, 960 (1st Cir. 1997).

The First Circuit Court of Appeals has "emphasized the importance of local rules similar to Local Rule 56 [of the District of Puerto Rico]." Hernández v. Philip Morris USA, Inc., 486 F.3d 1, 7 (1st Cir. 2007); *see also*, Colón v. Infotech Aerospace Services, Inc., 869 F.Supp.2d 220, 225-226 (D. Puerto Rico 2012).  Rules such as Local Rule 56 "are designed to function as a means of 'focusing a district court's attention on what is—and what is not—genuinely controverted.' " Hernández, 869 F.Supp.2d at 7 (*quoting* Calvi v. Knox County, 470 F.3d 422, 427 (1st Cir. 2006)).  Local Rule 56 imposes guidelines for both the movant and the party opposing summary judgment.  A party moving for summary judgment must submit factual assertions in "a separate, short, and concise statement of material facts, set forth in numbered paragraphs." Loc. Rule 56(b). A party opposing a motion for summary judgment must "admit, deny, or qualify the facts supporting the motion for summary judgment by reference to each numbered paragraph of the moving party's statement of facts." Loc. Rule 56(c).   If they so wish, they may submit a separate statement of facts which they believe are in controversy.   Facts which are properly supported "shall be deemed admitted unless properly controverted."  Loc. Rule 56(e); P.R. Am. Ins. Co. v. Rivera-Vázquez, 603 F.3d 125, 130 (1st Cir. 2010) and Colón, 869 F.Supp.2d at 226.  Due to the importance of this function to the summary judgment process, "litigants ignore [those rules] at their peril."  Hernández, 486 F.3d at 7.

## FINDINGS OF FACT

At the outset, the Court notes that Plaintiffs' opposition to Defendants' statement of uncontested  material  facts  is  procedurally  non-compliant  with  the  Local  Rules.   As previously mentioned, Loc. R. Civ. P. 56(c) specifically requires that the respondent either

Luis Rodríguez Ramos, et al. v. Department of Education, et al.
Civil No. 11-1653 (CVR)
Opinion and Order
Page 7

admit, deny, or qualify each of movant's proffered uncontested facts,  and for each denied

or qualified statement, the non-movant must cite the specific part of the record which

supports the denial or qualification.  If the non-moving party wishes, he can prepare its

separate statement of issues of material fact which he deems are in controversy, and which

preclude the entry of summary judgment.  See Loc. R. Civ. P. 56(c).  Plaintiffs failed to

properly deny many of Defendants' proffered facts, as many of the denials were not

supported by any record citation whatsoever.

       As second procedural matter, many of Plaintiffs' denials are also non-compliant,

insofar as many do not oppose the truth of the statement offered.  A review of Plaintiffs'

qualifications of Defendants' factual statements shows that they are either irrelevant to the

matter at hand, or consist of mere "speculation, generalities, conclusory assertions,

improbable inferences, and, for lack of a better phrase, a lot of 'hot air.' " Eli Lilly and Co.,

958 F.Supp. 721, 728 (D. Puerto Rico, 1997). Furthermore, many of Plaintiff's answers

consist of "admitted-denied" with a wholly self-serving explanation for the denial, citing

Plaintiff's deposition testimony.[5]  For instance, although Plaintiff admitted Defendants'

proffered fact no. 227, they then "denied" it, alleging it was not the correct "outcome" given

that particular plaintiff's years of experience and past jobs, thus injecting factual matters

into the original submission, with only Plaintiffs' testimony to proffer for the "denial".

       Another example of this are Defendants' proffered fact nos. 137, 138 and 139, which

all state that Defendants never asked Plaintiffs about their political affiliation.  While

admitting this, Plaintiffs then add that it was "not necessary to ask, since it was known", yet

---

       [5] See, e.g. Defendants' proffered fact nos. 191, 195, and 196.

they proffer no facts besides their self-serving testimony in support of such a claim. Others, like Defendants' proffered fact nos. 184 and 185, deny the statement and supply a citation to the record for this fact (yet another self-serving deposition statement), but the explanation offered does not contradict the proposed fact. For instance, Defendants' proffered fact no. 184 states that co-Defendant Rivera did not participate in the process of certifying eligible candidates for the position of Auxiliary Superintendent performed by the Recruitment Division. Plaintiff counters this statement with "Denied, since he sent a representative to these interview" (sic). While Plaintiff's proffered opposition statement may serve to perhaps add information about who was present at the interviews, the additional facts as proffered, even if considered, cannot serve to deny that Sánchez did not personally participate in the certification interview process. Insofar as this denial is not properly supported, it must be deemed as admitted pursuant to the Local Rules. Furthermore, Plaintiffs' proffered explanation offers additional facts that should have been included in a separate reply statement of material facts. Therefore, this fact, and all others like it, are in violation of the Local Rules and will not be considered by the Court.

Third, the Court is troubled to note that almost all of Plaintiffs' denials of Defendants' facts and their own proffered facts are unsupported by anything in the record except their deposition testimony, which are, of course, rather self serving and wholly conclusory. While deposition testimony is acceptable evidence, at the summary judgment stage, Plaintiffs must bring more to the table than their word, conclusions and opinions in their opposition. They must present facts, acts and documents to buttress their allegations, and cannot merely create an issue of fact by opposing all of Defendants' proffered facts with

their self-serving deposition testimony. Otherwise, it would be the same as proving the case with just the allegations in the complaint, and summary judgment would never be granted. At this stage, this is insufficient to oppose summary judgment. See , Garside v. Osco Drug, Inc., 895 F.2d 46 (1st Cir. 1990)("We have repeatedly held that, while notice pleading is sufficient to open the federal courthouse door, a party opposing a motion for summary judgment, properly put, may not ask the court to try the case in order to determine the facts); Castro-Medina v. Procter & Gamble Commercial Co., 565 F.Supp.2d 343 (D. Puerto Rico 2008 )("However, we note that the only evidence she provides in support of these conclusory allegations is her own deposition testimony, without any explanation or reference to evidence. 'Summary judgment cannot be defeated by relying on such conclusory allegations.' "(*quoting* Ríos-Jiménez v. Principi, 520 F.3d 31, 42 n. 7 (D. Puerto Rico 2008); Brisbin v. Aurora Loan Servs., LLC, 679 F.3d 748, 754 (8th Cir. 2012) (holding "self-serving affidavit not sufficiently specific to raise genuine issue of material fact in face of uncontradicted facts in record"); Hexcel Corp. v. Ineos Polymers, Inc., 681 F.3d 1055, 1063 (9th Cir. 2012) (*quoting* FTC v. Publ'g Clearing House, Inc., 104 F.3d 1168, 1171 (9th Cir. 1997) ("'[C]onclusory, self-serving affidavit[s], lacking detailed facts and any supporting evidence,' are insufficient to create a genuine issue of material fact"); Santiago v. Canon U.S.A., Inc., 138 F.3d 1 (1st Cir. 1998)("A plaintiff [claiming discrimination] 'may not prevail simply by asserting an inequity and tacking on the self-serving conclusion that the defendant was motivated by a discriminatory animus.'") (*quoting* Coyne v. City of Somerville, 972 F.2d 440, 444 (1st Cir. 1992)).

Luis Rodríguez Ramos, et al. v. Department of Education, et al.
Civil No. 11-1653 (CVR)
Opinion and Order
Page 10

Compounding Plaintiffs' troubles is the fact that for the statements offered for one of the Plaintiffs, Rodríguez, (referred to as "Exhibit I" of their opposition), they outright failed to include any deposition transcript as part of the record.  As a result of all these procedural mishaps by Plaintiffs, unless otherwise stated, the Court admitted most facts from Defendants' statement of uncontested material facts and did not accept Plaintiffs' submissions.

Finally, the Court must address Defendants' lengthy motion, statement of facts, and reply.  Although it is cognizant that this case is a contested one with many issues, it is undeniable that Defendants' reply to Plaintiff's statements contained a great deal of "copied and pasted" arguments, particularly in their opposition to Plaintiffs' uncontested facts. The Court advises Defendants that not all Judges are willing to accept the lengthy submissions they submitted, and urges them to select more carefully the contents of their briefs on future occasions.

In light of the documentary evidence before it, and based on the parties' submissions, the Court deems the following facts to be uncontested:[6]

### Law 7

1.      Plaintiffs filed the instant complaint on July 11, 2011. (Docket No. 1).

2.      On March 9, 2009, Law 7-2009 was approved. (D. Exhibit 84, Law 7-2009).

3.      In Chapter III of the law, a three phase plan is set forth to reduce government spending. These costs include those directly related to the payroll of

---

[6] Any facts not properly controverted were deemed admitted pursuant to the Local Rules, if evidence sustaining them was found in the record.

employees in public service.  Phase II is a severance plan to be employed in public service. The law provides that the layoff plan will apply only to agencies and employees that are not excluded by Section 37.02 of the law. (D. Exhibit 84, Law 7-2009, pgs. 77-96).

4.    Section 37.02 of Law 7-2009 provided that teachers assigned to the school classroom would be excluded from the provisions of Section 37.   Auxiliary Superintendents were not among those excluded from the layoff plan. (D. Exhibit 84, Law 7-2009, pgs. 86-87).

5.    Section 37.02 of Law 7-2009 was amended on July 10, 2009 by the Legislative Assembly to add exclusions from the law's layoff plan.  Again, Auxiliary Superintendents were not excluded.  (D. Exhibit 86, Law 37-2009, pgs.49-50).

6.    Section 37.04 of Law 7-2009 details the procedures and rights of employees affected by the layoffs. (D. Exhibit 84, Law 7-2009, pgs. 87-95).

7.    Pursuant to Section 37.04(b)3 of Law 7, the layoffs of employees with a permanent or career appointment were to be implemented by observance of the seniority criteria, so that those who had less seniority would be the first ones to be laid off. (D. Exhibit 84, Law 7-2009, Section 37.04(b)(3), pg.90).

8.    JREF means the Fiscal Restructuring and Stabilization Board, which was created pursuant to Section 37.04(b)(5) of Law 7, and which was entrusted with taking all the necessary actions for compliance with the law. ( D. Exhibit 84, Law 7-2009, Section 33(f), pg.78).

9.     The JREF was created by Section 37.04 (b)(5) of Law 7, and its members included the President of the Government Developmental Bank as its President, the Secretary of Labor, the Secretary of the Department of Economic Development and Commerce, the Secretary of the Department of the Treasury and the Executive Director of the Office of Management and Budget. (D. Exhibit 84, Law 7-2009, Section 37.04(b) 5, pgs. 90-91).

10.    The JREF had the necessary powers to undertake the tasks entrusted to it by Law 7-2009, including but not limited to: directing the agencies or departments in its care; conduct any necessary studies; obtain information from the different agencies in order to perform its tasks; and advise the Governor and the agencies regarding employees to be laid off. (D. Exhibit 84, Law 7-2009, Section 37.04(b) 6, pg.91).

11.    The JREF was tasked with the responsibility of determining the total number of employees to be laid off. (D. Exhibit 84, Law 7-2009, Section 37.04(b) 7 pg. 92).

12.    Pursuant to Law 7-2009, the agencies had to identify and certify the seniority of each of its employees and certify in writing and individually the date of seniority of the potentially affected employees as it appeared in their records. This information had to be supplied to the JREF within a term not greater than fifteen (15) calendar days after the beginning of Phase II. (D. Exhibit 84, Law 7-2009, Section 37.04(b) 8 p. 92).

13.     The layoffs under Phase II of Law 7 were implemented in a staggered manner beginning on July 1, 2009, and continuing during fiscal year 2009-2010. The JREF established the order in which the layoffs were implemented and during that process, the necessary measures were taken to ensure that the affected agencies continued to operate properly after the layoffs. (D. Exhibit 84, Law 7-2009, Section 37.04 (b) 16 pg. 95).

14.     The second round of dismissals, as determined by the JREF, was to be effective November 6, 2009, and would affect public employees who as of April 17, 2009, had less than thirteen (13) years six (6) months and zero (0) days of service.  (D. Exhibit 85, Circular Letter 2009-16, pg. 2 Part III section 3).

15.     Law 7 was not going to affect people who worked in schools, teachers, school directors and personnel who worked directly with the students in the academic area. (D. Exhibit 62, Del Valle's Deposition, pg. 42, lines 1-4).

### The 2009-10 Administrative Detail

16.     During the end of school year 2008-2009, the Department of Education was planning the 2009-2010 school year. The Department of Education had a budget deficit and there were over three hundred (300) school's directors positions that were open.  The central government was not going to assign additional monies to the Department for school director transitory positions. (D. Exhibit 79, Brenda Virella's ("Virella") Deposition, pg. 55, lines 22-25, pg.

56, lines 1-4; D. Exhibit 82, Circular Letter 1-2010-2011 dated July 13, 2010 Rivera, pg. 1, lines 1-4).

17. The Department of Education then carried out an internal analysis of the staff within the Department who complied with the school director requirements, and they identified several school Superintendents, Auxiliary Superintendents, teaching Facilitators and subject Supervisors who complied with those requirements. It was decided to send these people on administrative detail as School Directors for the 2009-10 year. (D. Exhibit 79, Virella's Deposition, pg. 56, lines 12-18, pg. 57, lines 7-13 pg. 58, lines 1-16).

18. Over three (300) hundred people who had certification as directors were sent on administrative detail. (D. Exhibit 62, Del Valle's Deposition, pg. 42, lines 22-24; Exhibit 72, Rodríguez' Deposition, pg. 32, lines 12-18; Exhibit 82, Circular Letter 1-2010-2011 dated July 13, 2010 Rivera, pg. 1, lines 1-4).

19. The administrative details were done to ensure that the 2009-10 school year started with the school director's positions filled, as well as meeting the existing needs before the beginning of the school year without affecting the payroll budget. Meetings were scheduled for this purpose in all seven (7) educational regions, to wit: Bayamón, Arecibo, Mayaguez, Ponce, Caguas, Humacao and San Juan. (D. Exhibit 2, Carmen Rosa's Deposition, D. Exhibit marked #1, Letter dated July 1, 2009 from Edward Moreno Alonso ("Moreno"), D. Exhibit 62, Del Valle's Deposition, pg. 42, lines 9-13; D. Exhibit 72, Rodríguez' Deposition, pg. 22, lines 6-9; D. Exhibit 79, Virella's

Deposition, pg. 58, lines 13-19; D. Exhibit 83, Román's Response to Interrogatory #6, pg. 5 lines 18-22).

20.　At the time of the administrative detail went into effect, Carlos Chardón was the Secretary of Education. (D. Exhibit 72, Rodríguez' Deposition, pg. 22, lines 6-9).

21.　Virella, Auxiliary Secretary of Human Resources Division from March 6, 2009 to December 11, 2009, gave the general orientation of how the process was going to be carried out. Prior to that orientation, Secretary of Education Chardón, and in his absence Deputy Secretary Edward Moreno would explain the reasons for the transfers, and questions were answered during the process. (D. Exhibit 79, pg. 46, lines 11-14, pg. 59, lines 9-17; D. Exhibit 83, Román's Response to Interrogatory #6, pg. 5 lines 19-26).

22.　In a meeting where Defendant Román was present, Moreno explained the purpose of the meeting, and Chardón asked the participants which of them had 13.5 years of service or less.  He stated that those employees would not have a job as a result of enactment of Law 7, because administrative positions were not protected. (D. Exhibit 83, Román's Response to Interrogatory #6, pg.5 lines 19-27; D. Exhibit 98, Román's Statement under Penalty of Perjury # 3 lines 1-7).

23.　Superintendents, Auxiliary Superintendents, both state and federal, educational facilitators and executive directors were sent on administrative detail.  Even individuals who were working at the administrative level were

sent on detail to schools. (D. Exhibit 62, Del Valle's Deposition, pg. 41, lines 7-21).

24.   As to the process of selecting schools regarding the administrative detail, School Superintendents would select first within their own district, followed by Auxiliary Superintendents, School Facilitators and Subject Supervisors. (D. Exhibit 62, Del Valle's Deposition, pg. 43, lines 7-13, D. Exhibit 79, Virella's Deposition, pg. 58, lines17-25, pg.59, lines 1-8; D. Exhibit 2, Rosa's Deposition Exhibit marked #1, Letter dated July 1, 2009 from Moreno; D. Exhibit 98, Román's Statement under Penalty of Perjury, # 6 lines 1-6).

25.   The letters assigning the administrative details were prepared for three hundred (300) positions. These letters were created with a merge program, and had some basic language and also had blanks where specific information was entered into the document. (D. Exhibit 79, Virella's Deposition, pg. 63, lines 10-20).

26.   The detail letters did not include a notice regarding the right to challenge or appeal the transfer because it was a voluntary action by the employee. (D. Exhibit 79, Virella's Deposition, pg. 63, lines 21-25, pg. 64, lines 1-2; D. Exhibit 66, Del Valle's administrative detail letter dated July 6, 2009; D. Exhibit 76, Rodríguez' administrative detail letter dated July 8, 2009; D. Exhibit 80, Arroyo's administrative detail letter dated July 14th, 2009).

### The School Director Positions

27. In the fall of 2009, the Department of Education identified thirty-eight (38) employees occupying positions of Auxiliary Superintendents, Superintendents, Subject Supervisors, Teaching Facilitators, among others, who by April 17, 2009 did not have the required time the avoid Law 7's impact, and who at that moment were on administrative detail as School Directors. (D. Exhibit 89, Presentation to JREF (Exceptions (38) Administrative Detail as School Directors) pgs. 10-12; D. Exhibit 90, María Lizardi's ("Lizardi") Statement Under Penalty of Perjury #4 to #6 and #21).

28. In a meeting held on October 1, 2009 between the Department of Education and the JREF, the latter approved the exceptions related to the thirty-eight (38) employees in career positions of Superintendents, Auxiliary Superintendents, Subject Supervisor and Teaching Facilitators and others to remain in administrative detail as School Directors only if they accepted a demotion to that particular classification upon termination of the detail. (D. Exhibit 91, Email: Summary of Today's Decisions and Next Steps, pg. 2 Caption: Exceptions 1st paragraph; D. Exhibit 90, Lizardi's Statement under Penalty of Perjury #4 to #8; D. Exhibit 95, Virella's Deposition 2nd part, pg. 13, lines 16-25).

29. A proposal was therefore made to the employees affected by the second round of layoffs to accept a demotion to School Directors in order to protect and exclude them from the layoffs, as approved by JREF. Those who accepted the

proposal submitted a letter requesting the demotion, which was notified to the JREF by electronic mail. (D. Exhibit 90, Lizardi's Statement Under Penalty of Perjury #10, # 23; Exhibit 91, Summary of Today's decisions and Next Steps, pg. 2 Caption: Exceptions 1st paragraph; D. Exhibit 96, Email to Andrés Arsuaga (GDB) ("Arsuaga") from Lizardi).

30.    The proposal to the employees involved in the demotion to School Director was a process that was undertaken by the School Region Directors. (D. Exhibit 95, Virella's Deposition 2nd part, pg. 15, lines 11-17).

31.    Virella gave the orientation to the Regional Directors, not to the people who were going to be accepting the demotions.  This was a completely voluntary process. (D. Exhibit 95, Virella's Deposition 2nd part, pg. 20, lines 17-22).

32.    Plaintiffs Del Valle and Rodríguez were among the thirty-eight (38) employees in administrative detail as School Directors who were going to be affected by the second round of layoffs  – they both submitted a demotion letter by electronic mail to JREF. (D. Exhibit 89, Presentation to JREF-Exceptions (38) Administrative Detail as School Directors, pg. 11; D. Exhibit 87, Del Valle's Demotion Letter; D. Exhibit 88, Rodríguez' Demotion Letter; D. Exhibit 96, Email to Arsuaga (GDB) from Lizardi).

33.    For the school year commencing August 2009, personnel at the district level without a school director certificate remained at the district. (D. Exhibit 19, Arroyo's Deposition, pg. 56, lines 6-12).

34.   Nurses, secretaries, administrative assistants, technology teachers and janitors were some of the personnel who remained at the district level. (D. Exhibit 19, Arroyo's Deposition, pg. 56, lines 13-16).

**The 2010 Reorganization**

35.   In a letter dated June 25, 2010 from Rivera, Interim Secretary, he notified personnel of an orientation to be held on July 1 and 2, 2010, regarding the reorganization of the school districts and the academic priorities for the 2010-11 school year. (D. Exhibit 5, Rosa's Deposition Exhibit marked # 7, Letter dated June 25, 2010 issued by the DE from Rivera notifying meetings for July 1 and 2, 2010).

36.   The reorganization was implemented across the island. (Exhibit 19, Arroyo's Deposition, pg. 121, lines 22-23).

37.   For some time, the Department of Education had been involved in a process of corrective measures to address longstanding grant management and accountability issues regarding the administration of Federal education grants. One of those issues was that federal funds were not being used in accordance with the grant and federal law requirements – they were instead being used to cover Department of Education payroll expenses, when their use was destined for federal programs. (D. Exhibit 90, Lizardi's Statement under Penalty of Perjury, # 13; D. Exhibit 102, Letter June 3, 2010 to Hon. Gov. Fortuño and Rivera).

38.     In March 2010, the Department of Education, with the assistance of the Federal Department of Education, underwent a process in order to make certain that federal appropriations were used according to the grant requirements and federal law. This resulted in a federal proposal where an organizational chart on the basis of functions and areas of expertise was developed.  A local matching process was then performed, in which the existing positions of Superintendent, Auxiliary Superintendent, School Director and Teaching Facilitators, together with their respective functions, were matched with their functional equivalent in federal organizational chart. (D. Exhibit 90, Lizardi's Statement under Penalty of Perjury, # 13- #14; D. Exhibit 99, Organizational Chart School District).

39.     A two-part structure resulted from the matching process.  On one side was the academic/teaching side (local) and the other was the technical assistance (federal) side.  On the technical assistance side, the functions performed by Auxiliary Superintendents related to federal grants could only be supervised by a Superintendent, which was the next and highest position. (D. Exhibit 90, Lizard's Statement under Penalty of Perjury, #16; D. Exhibit 99, Organizational Chart School District.)

40.     There is a hierarchy within the Classification Plan of the Department of Education-Trust Positions.  Special Aide III, a trust position, had the ability to supervise a Superintendent.  Special Aides III are commonly located at Secretariats, which are structurally above a School District.  An appointed

Superintendent in a trust position – like a Special Aide III position –  can supervise a Superintendent (head of the technical/federal side) and an Auxiliary Superintendent (academic/teaching/state side) as well. (D. Exhibit 99, Organizational Chart School District; Exhibit 90, Lizardi's Statement under Penalty of Perjury, #15, #17 and #24).

41.    Special Aide III was responsible for the implementation of the Department of Education's academic public policy and supervised compliance with the technical assistance component directives of the US Department of Education. (D. Exhibit 90, Lizardi's Statement under Penalty of Perjury, #18).

42.    The Special Aide in charge of a District is a trust position. (D. Exhibit 72, Rodríguez' Deposition, pg. 84, lines 15-17).

43.    There are differences between the duties of a Special Aide in charge of the District and a Superintendent. The Superintendent is in charge of all the academic activities in the schools and teaching duties. The Special Aide has the same duties and in addition, supervises the Superintendent and oversees the district's  personnel. (D. Exhibit 72, Rodríguez' Deposition, pg. 86, lines 4-15).

44.    As of 2014, the School Superintendent/Special Aide III position exists. At least one of those positions was held by a School Director and not by a School Superintendent while Plaintiff Arroyo was Special Aide to the Undersecretary of Academic Affairs in 2013.  (D. Exhibit 19, Arroyo's Deposition, pg. 143, lines 4-25, pg. 144, lines 1-12).

45.  By June 2, 2010, an agreement had been reached with the federal Department of Education to establish a new structure that consolidated the school districts and reduced them from eighty-nine (89) to twenty-eight (28), with the objective of strengthening the student's academic achievements. (D. Exhibit 97, Statement under Penalty of Perjury Rivera #16).

46.  In February 2010, Dr. Piñeiro, Secretary of Education after Dr. Chardón left, worked with the Federal Department of Education in the development of the new school district structure. (D. Exhibit 97, Statement under Penalty of Perjury Rivera #15 lines 1-3).

47.  When he was named Interim Secretary of the Department of Education in June 2010, Defendant Rivera implemented the new school district structure he had inherited.  He had no participation in the development or design of the new school districts – when the program was being developed by Dr. Piñeiro, he was Under Secretary for Academic Affairs,  a position which did not include administrative matters. (D. Exhibit 97, Statement under Penalty of Perjury Rivera, #5 lines 3-4 #7 lines 2-5; and #15 lines 1-5.)

48.  In July, 2010, the Secretariat of Human Resources of the Department of Education proceeded to notify the end of the administrative detail for school year 2009-2010 that had been established by Dr. Chardón.  These employees were then placed within the new structure of the consolidated school districts. (Exhibit 97, Statement under Penalty of Perjury #17).

49. The result of the schools' compliance with 2014 state and federal standards of academic achievement was that the schools then could be removed from the School Improvement Plan, thus avoiding the possibility of placing at risk federal funds from the "No Child Left Behind" federal law.  By 2010, half of the public schools (about 730) were in the School Improvement Plan. (D. Exhibit 97, Statement under Penalty of Rivera #10).

**Co-Defendant Rivera**

50. Between January 1, 2009 and December 31, 2009, Defendant Rivera was employed as a Professor at the University of Puerto Rico, Ponce campus, as part of the Teacher's Professional Development Division.  The University of Puerto Rico was his official employer.   (D. Exhibit 97, Statement under Penalty of Rivera, #2 lines 1-2; and #3 lines 2-4).

51. Defendant Rivera did not have any participation in any matters related to the administrative detail that was implemented during 2009-10 school year, or with any personnel transactions.  At the time they were done, he did not hold a position within the Department of Education. (D. Exhibit 97, Statement under Penalty of Perjury Rivera #3 lines 1-3).

52. Defendant Rivera personally interviewed and considered all Superintendents interested in occupying a position of Special Aide III (trust position) that were to be in charge of the newly structured school districts. (D. Exhibit 97, Statement under Penalty of Perjury Rivera #11 lines 1-4).

53.     Defendant Rivera was interested in recruiting the best resources among the Superintendents interested in the position of Special Aide III for the benefit of the students, regardless of political affiliation. (D. Exhibit 97, Statement under Penalty of Rivera #11 lines 4-6).

54.     Among the resources that Rivera understood best served the students' interests, were some Superintendents affiliated to the PDP.  Mr. Carlos Iván Morales and Dr. José Altieri, both of whom were affiliated with the PDP, were appointed to the trust position of Special Aide III. (D. Exhibit 97, Statement under Penalty of Perjury Rivera #11 lines 6-13).

55.     As Secretary of Education, Rivera collaborated in the making of public policy in the area of education under the administration of former Gov. Fortuño. (D. Exhibit 97, Statement under Penalty of Perjury Rivera #12 lines 1-2).

56.     The Special Aide III/School Superintendent assisted co-Defendant Rivera in the making and implementation of public policy in education. (Exhibit 97, Statement under Penalty of Perjury Sánchez #12 lines 1-2 and 6-10).

57.     Examples of this was when Special Aide III/School Superintendents assisted co-Defendant Rivera when a study was conducted to identify the number of bilingual students in public school, in order to establish the need to develop projects to increase the number of students in said area to ensure the eventual success of the graduates. This allowed the Department of Education to establish a public policy for the creation of special projects in different

schools in Puerto Rico, which were paid by federal and state funds. (D. Exhibit 97, Statement under Penalty of Perjury Rivera #12 lines 1-10).

58.    Special Aide III/Superintendents had to communicate the Fortuño Administration's public policy (both state and federal components) to each of their respective school districts.   (D. Exhibit 97, Statement under Penalty of Perjury Rivera #13 lines 1-6; D. Exhibit 101, DE-16 Special Aide III item #2).

59.    Given the Special Education Program's complexity, an Associate Secretariat was created.  The Associate Secretariat had its own work plan, established its own agenda and work calendar in order to comply with the requirements of the federal and state governments. (D. Exhibit 97, Statement under Penalty of Perjury Rivera #26 lines 3-7).

60.    The Associate Secretariat has an Associate Secretary for Special Education, who is directly responsible for establishing the public policy and complying with federal and state requirements for that area. (D. Exhibit 97, Statement under Penalty of Perjury Rivera #27 lines 1-3).

61.    The Associate Secretary has the responsibility to ensure that all employees of the Associate Secretariat comply with their responsibilities in the time frame established in the work plan. This includes any person in a position that has any impact or relation with the students of the Special Education program, like the School Director. (D. Exhibit 97, Statement under Penalty of Perjury Rivera #27 lines 1-6).

62. Part of the duties and responsibilities of the Associate Secretariat are to ensure the strict compliance with the requirements of federal and state governments by monitoring the different divisions. (D. Exhibit 97, Statement under Penalty of Perjury Rivera #28 lines 1-2).

63. The issues surrounding the scheduling, periods to cover and who gets monitored is determined exclusively by the Associate Secretariat of the Special Education Program. (D. Exhibit 97, Statement under Penalty of Perjury Rivera #28 lines 1-4).

64. Rivera, as Secretary of Education, had no interference, control or participation of any kind in the monitoring, reporting, or in the subsequent follow-ups for cases that were opened. (Exhibit 97, Statement under Penalty of Perjury Rivera #29 lines 1-2).

65. If the Associate Secretariat of Special Education understands an employee did not comply with laws or regulations, thus resulting in adverse action, they are referred to the legal division. (D. Exhibit 97, Statement under Penalty of Perjury Rivera #29 lines 2-4).

66. According to the laws and regulations, the Secretary of Education, as the head of the Department, must sign the letter notifying an employee the intention of commencing a disciplinary process, whose sanction could range from a written admonishment up to the firing of an employee.

67. As applied to the case at bar, the signing of this notice for Plaintiff Del Valle was Defendant Rivera's only participation in the disciplinary proceeding that

was commenced against this Plaintiff. (D. Exhibit 97, Statement under Penalty of Perjury Rivera #29 lines 4-8).

68.  Co-Defendant Rivera has no knowledge of any Plaintiffs' political affiliation, participation and/or preference. (D. Exhibit 81, Rivera's Response to Interrogatory no. 9, pg.4 lines 11-12).

69.  Co-Defendant Rivera had never spoken with Plaintiffs Rosa, Del Valle or Rodríguez about their participation in political activities. (D. Exhibit 97, Statement under Penalty of Rivera #34).

70.  Co-Defendant Rivera does not personally know Plaintiffs Rosa, Del Valle or Rodríguez. (D. Exhibit 97, Statement under Penalty of Perjury of Rivera #34).

71.  Co-Defendant Rivera resigned as Secretary of the Department of Education on October 24, 2011. (D. Exhibit 81, Rivera's Response to Interrogatory #11, pg. 5 lines 10-11).

### Co-Defendant Román

72.  In 2008, Román was an Auxiliary Superintendent for Title I Federal Program. (D. Exhibit 98, Román's Statement under Penalty of Perjury, # 1, lines 6-7 .)

73.  On July 6, 2009, Román was called to a meeting by Secretary of Education Chardón. At that meeting, she was informed that the Department of Education was implementing Law 7, as well as of the corrective actions of the Memorandum of Agreement and the Compliance Agreement signed with the

Federal Department of Education. (D. Exhibit 98, Román's Statement under Penalty of Perjury, # 2 lines 1-2, #3 lines 5-7).

74. During the meeting, they announced the administrative detail, and clarified that after that year, depending on the status of Law 7, everyone would be returning to their former positions. (D. Exhibit 98, Román's Statement under Penalty of Perjury, #4 lines 5-10).

75. On January 19, 2010, Román was appointed Special Aide to the Under Secretary for Academic Affairs at the central office with Rivera. (D. Exhibit 98, Román's Statement under Penalty of Perjury #8).

76. Román's duties as Special Aide to the Under Secretary of Education for Academic Affairs, as assigned by former Secretary of Education Dr. Piñeiro, were related to academic issues and school improvements. (D. Exhibit 98, Román's Statement under Penalty of Perjury, #9 lines 1-4).

77. Defendant Román retired in December of 2012, after a 30+ year career. (D. Exhibit 98, Román's Statement under Penalty of Perjury, #18 line 8).

**Plaintiff Rosa**

78. Plaintiff Rosa is at present retired from the Department of Education; her resignation was effective February 28, 2011. (D. Exhibit 8, Rosa's Deposition Exhibit marked # 14, Letter of Acceptance of Resignation due to Retirement; Exhibit 15, Rosa's Appointment and Changes Report-Retirement).

79.   By June-July of 2009, Plaintiff Rosa was occupying the permanent career position of Auxiliary Superintendent Title I. (D. Exhibit 1, Rosa's Deposition, pg. 28, line 25; pg. 29 lines 1-2; pg. 77 lines 5-7).

80.   On July 7, 2009 Plaintiff Rosa received a letter regarding the administrative detail, and went to the meeting regarding that matter in Arecibo on July 8th, 2009. (D. Exhibit 2, Rosa's Deposition Exhibit marked #1, Letter dated July 1, 2009 from Moreno).

81.   On July 9, 2009, Plaintiff Rosa wrote to the U.S. Department of Education to express her concerns about what was going to happen with her functions as Title I Superintendent, as she was paid with federal funds, and they could not be used to pay for her administrative detail as school director.  In her letter, Plaintiff stated that the administrative detail was due to the financial situation in Puerto Rico. (D. Exhibit 1, Rosa's Deposition, pg. 144, lines 2-12); D. Exhibit 3, Rosa's Deposition Exhibit marked # 2, Letter dated July 9, 2009 signed by Plaintiff Rosa addressed to the U.S. Department of Education.).

82.   Plaintiff Rosa received a letter dated July 23, 2009 from Moreno, Interim Secretary of the Department of Education, which notified her that "effective July 28, 2009, and for need of service, it has been determined to send you in administrative detail, in the position that you occupy, number F75219, as Auxiliary Superintendent of Schools IV of San Lorenzo District to direct the María T. Delgado de Marcano School.  This action will not affect your salary, status, classification, and it was taken in consideration of your certification

as School Director.  This detail will be for the school year 2009-2010." (D. Exhibit 1, Rosa's Deposition, pg. 145, lines 15-19); D. Exhibit 4, Rosa's Deposition Exhibit marked # 4, Letter dated July 23, 2009 to Plaintiff Rosa from Moreno; Exhibit 11, Rosa's Appointment and Changes Report-Adm. Detail).

83.  Plaintiff Rosa was notified of her right to appeal to the Appellate Commission of Human Resources' Administration ("CASARH") if she did not agree with the personnel transaction regarding her administrative detail, which she did. Because it took so long, by the time a response was received, the administrative detail had ended and she had been reinstated as Auxiliary Superintendent for Title I. (D. Exhibit 1, Rosa's Deposition, pg. 145, lines 15-25; pg. 146 lines 1-9; D. Exhibit 4, Rosa's Deposition Exhibit marked # 4, Letter dated July 23, 2009 to Plaintiff Rosa from Moreno).

84.  During the 2009-10 school year, while Plaintiff Rosa was performing the duties of director at the María T. Delgado School, nobody occupied her position of Auxiliary Superintendent for Title I, or performed the functions pertaining to her position. (D. Exhibit 1, Rosa's Deposition, pg. 76, lines 14-24).

85.  During Plaintiff Rosa's administrative detail as School Director at the María T. Delgado school, she received the same salary of the position that she held as Auxiliary Superintendent Title I. (D. Exhibit 1, Rosa's Deposition, pg. 140,

lines 15-23; D. Exhibit 11, Rosa's Appointment and Changes Report-Adm. Detail).

86.  Plaintiff Rosa performed all the functions of School Director as indicated in form DE-16 during her administrative detail at the María T. Delgado School. This form indicates what the School Director functions are. Additionally, she participated in interviews to recruit two (2) teachers around beginning of September 2009.  (D. Exhibit 1, Rosa's Deposition, pg. 169, lines 5-25; pg. 170, lines 1-6; D. Exhibit 9, Rosa's Deposition's Exhibit marked #9).

87.  On June 25th or June 26th, 2010 Plaintiff Rosa received a letter notifying her she was being reinstated to her position as Auxiliary Superintendent Title I at the School District of Yabucoa, effective July 1, 2010, and that the administrative detail would end  on June 30, 2010.  She was also notified of her right to appeal this decision before CASARH.  (D. Exhibit 1, Rosa's Deposition, pg. 80, lines 1-7; D. Exhibit 6, Rosa's Deposition Exhibit marked #6, Letter dated June 25, 2010 to Plaintiff Rosa from Rivera; D. Exhibit 12, Rosa's Appointment and Changes Report- Reinstatement).

88.  Plaintiff Rosa filed an appeal on July 23, 2010 before CASARH regarding her reinstatement to Yabucoa, claiming that it was a hardship to her given the distance she had to travel to and from work. (D. Exhibit 1, Rosa's Deposition, pg. 153, lines 15-25; pg. 154, lines 1-7, 15-18; and pg. 155, lines 18-20).

89.  Plaintiff Rosa's petition for transfer from the District of Yabucoa to the District of Gurabo was granted effective September 20, 2010. (D. Exhibit 1,

Rosa's Deposition, pg. 94, lines 11-14; D. Exhibit 7 Rosa's Deposition Exhibit marked #11, Letter dated September 16, 2010 to Plaintiff Rosa from Rivera; D. Exhibit 13, Classification and Payment-Reassignment or Transfer of Position; D. Exhibit 14, Rosa's Appointment and Changes Report- Transfer).

90.   Since Plaintiff Rosa's reinstatement to the position of Auxiliary Superintendent Title I, she has occupied said position and has performed all the duties pertaining to it up until her retirement. (D. Exhibit 1, Rosa's Deposition, pg. 111, line 25; pg. 112, lines 1-8; pg. 181, lines 20-25; and pg. 182, line 1).

91.   While Plaintiff Rosa was at the District of Yabucoa as Auxiliary Superintendent, she performed all her functions except for function no. 7 of the DE-16 Position Description of Auxiliary Superintendent. Said function was not performed by a Superintendent/Special Aide to the Secretary. (D. Exhibit 1, Rosa's Deposition, pg. 170, lines 17-25; pg. 175, lines 9-15, pg. 176, lines 8-17; D. Exhibit 10, Rosa's Deposition Exhibit marked # 17).

92.   Plaintiff Rosa does not personally know Rivera or his political affiliation; she only knows him as the Secretary of Education. (D. Exhibit 1, Rosa's Deposition, pg. 115, lines 21-22,  pg. 116, lines 8-14).

93.   Plaintiff Rosa does not have personal knowledge of Román's political affiliation. (D. Exhibit 1, García's Deposition, pg.116, lines15-25; page 117, lines 1-9).

94.   Plaintiff Rosa and Defendant Rivera never spoke about their political affiliation or party politics. (D. Exhibit 1, Rosa's Deposition, pg. 118, lines 9-22).

95.   Plaintiff Rosa and Defendant Román never spoke about their political affiliation or party politics. (D. Exhibit 1, Rosa's Deposition, pg. 118 lines 23-25; pg. 119, lines 1-12).

96.   Plaintiff Rosa did not apply for the position of Superintendent during the years 2009 or 2010.  (D. Exhibit 1, Rosa's Deposition, pg. 120, lines 10-16).

**Plaintiff Arroyo**

97.   Plaintiff Arroyo, a School Superintendent III at Caguas II's School District, was sent on administrative detail as school director to the Bunker School in the same district, effective July 24, 2009. No change in position classification or decrease in salary occurred. (D. Exhibit 16, Arroyo's Appointment and Changes Report-Adm. Detail).

98.   During Plaintiff Arroyo's administrative detail, no one was appointed to her old position of Superintendent. (D. Exhibit 19, Arroyo's Deposition, pg. 57, lines 9-12).

99.   After the conclusion of her detail, on July 1, 2010, Plaintiff Arroyo was reinstated to her position of School Superintendent in Gurabo's School District. She was notified of her right to appeal said personnel transaction. (D. Exhibit 17, Arroyo's Appointment and Changes Report-Reinstatement; D. Exhibit 21, Letter to Arroyo from Rivera, Interim Secretary).

100.     During the 2010-11 school year, Arroyo was a leader in the newly created Technical Assistance Unit.   Said unit was established in Puerto Rico in conjunction with the federal government. (D. Exhibit 19, Arroyo's Deposition, pg. 87, lines 5-13).

101.     During that first year of the unit, Arroyo developed tools and processes which were not solely for the benefit of Gurabo's District but were also shared with other twenty-seven (27) districts, and obtained satisfactory results in the eyes of the federal government for that year. (D. Exhibit 19, Arroyo's Deposition, pg. 88, lines 3-9).

102.     After the reorganization of the school districts, she was appointed "School Superintendent-Technical Assistant", a position that supervised five (5) Auxiliary Superintendents.  The Superintendent-Technical Assistant supervised and evaluated the Auxiliaries, among other duties. (D. Exhibit 18, Organizational Chart of Schools District; D. Exhibit 20, Arroyo's DE-16 Superintendent-Technical Support -item #11).

103.     After the reorganization, the Auxiliary Superintendents under Arroyo's leadership carried out activities grouped in ten (10) large areas which were subdivided into forty (40) smaller areas. (D. Exhibit 19, Arroyo's Deposition, pg. 103, lines 3-11; pg. 106, lines 24-25; pg.107, line 1; D. Exhibit 20, Arroyo's DE-16-School Superintendent-Technical Assistance).

104.     As part of Plaintiff Arroyo's functions, she visited School Directors and supervised her Auxiliary Superintendents. (D. Exhibit 19, Arroyo's

Deposition, pg. 107, lines 20-23.; D. Exhibit 20, Arroyo's DE-16- School Superintendent-Technical Assistance).

105.   From January to September 2013, Plaintiff Arroyo was appointed to a trust position as Special Assistant to the Undersecretary of Academic Affairs.  (D. Exhibit 19, Arroyo's Deposition, pg. 90, lines 14-21; pg. 91, lines 19-21).

106.   Plaintiff Arroyo retired from the Department of Education in February, 2014. At that time, she was occupying the position of Superintendent of School-Technical Assistant at the Gurabo District. (D. Exhibit 19, Arroyo's Deposition, pg. 90, lines 6-13).

107.   Plaintiff Arroyo has participated in polling stations, motorcades, walkabouts and fund-raising activities for the PPD.  She has never seen co-Defendants Rivera or Román in those activities. (D. Exhibit 19, Arroyo's Deposition, pg. 100, lines 23-25, pg. 101, lines 1-16).

108.   Arroyo met with Defendant Rivera on several occasions and spoke with him about professional issues. (D. Exhibit 19, Arroyo's Deposition, pg. 118, lines 9-13).

109.   Defendant Rivera never asked Plaintiff Arroyo about her political affiliation. (D. Exhibit 19, Arroyo's Deposition, pg. 121, lines 24-25; pg. 122, lines 1-2).

110.   Plaintiff Arroyo never told Defendant Román about her political affiliation. (D. Exhibit 19, Arroyo's Deposition, pg. 124, lines 14-17).

## Plaintiff Del Valle

111. Plaintiff Del Valle started working at the Department of Education on September 20, 1999 as a School Social Worker. (D. Exhibit 92, Certification issued by Dept. of Education of Del Valle's positions).

112. Plaintiff Del Valle was appointed to the career position of Auxiliary Superintendent on a probationary basis effective September 3, 2008 with a monthly salary of $2,835.00. Before that, he occupied a permanent position as a School Director in the San Juan School District. (D. Exhibit 62, Del Valle's Deposition, pg. 22, lines 8-15; D. Exhibit 64, Del Valle's Personnel File-Report Appointment and Changes).

113. Del Valle and Rodríguez were present at the July, 2009 meeting where Secretary Chardón informed the employees of the Bayamón Region that they had to be sent to schools as directors to protect them from Law 7. (D. Exhibit 62, Del Valle's Deposition, pg. 35, lines 24-25, pg. 36, lines 1-6, lines 21-23;pg.37, lines 9-21; D. Exhibit 83, Román's Response to Interrogatory #6, pg. 5 lines 24-27, pg. 6, D. Exhibit 72, Rodríguez' Deposition, pg. 22, lines 6-21, pg. 23, lines 9-11).

114. Plaintiff Del Valle did not have the years of service at the Department of Education or in any other government agency to remain unaffected by Law 7. He was sent to a school to be protected from Law 7. (D. Exhibit 62, Del Valle's Deposition, pg. 38, lines 7-19; pg. 39, lines 16-20; D. Exhibit 92, Certification issued by Dept. of Education of Del Valle's Positions).

115. Plaintiff Del Valle was sent on administrative detail as School Director to Cacique Agueybaná School in Bayamón from July 16, 2009 until June 30, 2010.  There was no change in position classification or in his salary. (D. Exhibit 62, Del Valle's Deposition, pg. 19, lines 10-14; pg. 44, lines 12-18; pg.45, lines 2-4; D. Exhibit 65, Del Valle's Personnel File-Report Appointments and Changes; D. Exhibit 66, Letter dated July 6, 2009 from Virella, Deputy Secretary of Human Resources, Department of Education).

116. Plaintiff Del Valle submitted a letter requesting a demotion to the position of School Director on October 6, 2009. (D. Exhibit 87, Demotion Letter dated October 6, 2009).

117. Del Valle was informed by Chardón via a letter dated November 6, 2009 that the lay-off letter that had been notified on September 25, 2009, was being left without effect.  His employment would not cease effective November 6, 2009, as previously notified.  This determination was taken after the JREF authorized the exclusion of his job classification. (D. Exhibit 62, Del Valle's Deposition, pg. 63, lines 3-20; D. Exhibit 69, Letter dated November 6, 2009 from Chardón, Secretary of the Department of Education).

118. Defendant Rivera authorized the formal appointment of Del Valle to the position of School Director of the Cacique Agueybaná School effective July 1, 2010 with a salary of $3,110. This salary included a $250.00 differential. (D. Exhibit 67, Del Valle's Personnel File-Report Appointments and Changes; D. Exhibit 68, Letter dated June 30, 2010 from Rivera).

119.  On February 10, 2011, Plaintiff Del Valle received a letter from Secretary of Education Rivera notifying him of the intention of commencing a disciplinary process against him that could entail sanctions that ranged from a written reprimand to dismissal . (D. Exhibit 70, Letter February 10, 2011 from Rivera; D. Exhibit 62, Del Valle' Deposition, pg. 100, lines 8-12).

120.  The letter of intent stated that the Monitoring and Compliance Unit of the Special Education Associate Secretariat had performed a compliance monitoring, where visits were made February 11, 12, and 13 of 2009 to the district where Plaintiff Del Valle worked. (Exhibit 70, Letter February 10, 2011 from Rivera).

121.  The letter further stated that a report was issued on May 11, 2009 indicating the following findings:  non-compliance with Indicators 1, 2, 13 and 14; lack of PEI with measurable goals and objectives for students in process of Secondary Transition; that procedural guarantees were not used for the transition; lack of class plans; non-compliance with Indicators 13 and 14; and non-compliance with Indicators 13 and 14 by 2 teachers, María Morales Negrón and Lourdes Core Vélez (Exhibit 70, Letter February 10, 2011 from Rivera).

122.  The letter informed Del Valle that he had the right to request an informal administrative hearing, where he could challenge the charges that were being brought against him. (D. Exhibit 70, Letter February 10, 2011 from Rivera).

123.  Plaintiff Del Valle requested the administrative hearing, where he was represented by attorney Vanessa Caraballo. (D. Exhibit 62, Del Valle's Deposition, pg. 102, lines 17-24).

124.  On December 12, 2012, the Department of Education closed the disciplinary proceeding initiated against Plaintiff Del Valle after the Official Examiner recommended the dismissal of the disciplinary proceedings. (D. Exhibit 71, Letter dated December 12, 2012 from Nilda Ortiz Rodríguez, Interim Secretary).

125.  Plaintiff Del Valle and Defendant Román hardly ever spoke. When they did, they did not speak about politics, even if she was present in an interview in which Plaintiff Del Valle participated. (D. Exhibit 62, Del Valle's Deposition, pg. 93, lines 18-22).

126.  During the interactions that Plaintiff Del Valle had with Defendant Román, they did not speak about their respective political affiliations. (D. Exhibit 62, Del Valle's Deposition, pg. 94, lines 9-15).

127.  Plaintiff Del Valle never spoke with Defendant Rivera about his political affiliation. (D. Exhibit 62, Del Valle's Deposition, pg. 109, lines 13-15).

128.  Plaintiff Del Valle was appointed to the trust position of Special Aide II to the Secretary of Education effective January 3, 2013, with a salary of $6,250.00. (D. Exhibit 63, Del Valle's Report Appointments and Changes; D. Exhibit 92, Certification issued by Dept. of Education of Del Valle's Positions).

129.   Effective March 12, 2014, Plaintiff Del Valle was appointed to the trust position of  Regional Director for San Juan. (D. Exhibit 62, Del Valle's Deposition, pg. 15, lines 24-25; pg. 16, lines 6-7).

### Plaintiff Rodríguez

130.   Plaintiff Rodríguez worked for the Treasury Department for a period of three (3) years and two (2) months. (D. Exhibit 94, Treasury Department's Certification ).

131.   Plaintiff Rodríguez started working at the Department of Education as Elementary Teacher on September 10, 1999. (D. Exhibit 93, Dept. of Education's Certification).

132.   Plaintiff Rodríguez was appointed to the career position of Auxiliary Superintendent on a probationary basis effective August 27, 2008 with a salary of $2,700.00.  Before that, he occupied the permanent position of Elementary School Director III in the Vega Alta School District.  (Exhibits 73 and 74, Rodríguez' Personnel File-Report Appointment and Changes).

133.   By the cutoff date set by JREF of April 17, 2009, Plaintiff Rodríguez had less than the thirteen (13) years six (6) months and zero (0) days of service required in order to avoid being laid off.  (D. Exhibit 85, Circular Letter 2009-16; D. Exhibit 93, Dept. of Education's Certification; Exhibit 94, Treasury Department Certification).

134.   Plaintiff Rodríguez was sent on administrative detail as School Director of the Rafael Hernandez Marín School in Vega Baja District, effective July 16, 2009

until June 30, 2010.  He had the same salary of $2,700.00 and no change in his classification occurred.  (D. Exhibit 75, Rodríguez' Personnel File-Report Appointments and Changes; D. Exhibit 76, Letter dated July 8, 2009 from Virella, Deputy Secretary of Human Resources, Department of Education ).

135.  Plaintiff Rodríguez submitted a letter requesting a demotion to the position of School Director on October 7, 2009. (D. Exhibit 88, Demotion Letter dated October 7, 2009).

136.  Defendant Rivera authorized the formal appointment of Plaintiff Rodríguez to the position of School Director of the Rafael Hernández School effective July 1, 2010 with a salary of $3,025.00.  This salary included a differential of $250.00 for the position. (Exhibit 77, Rodríguez' Personnel File-Report Appointments and Changes; Exhibit 78, Letter dated June 30, 2010 from Rivera).

137.  Román never asked Plaintiff Rodríguez about his political affiliation.  (D. Exhibit 72, Rodríguez' Deposition, pg. 44, lines 9-12).

138.  During the interviews for Auxiliary Superintendent in Bayamón, Vega Alta and Manatí, Plaintiff Rodríguez was never was asked about his political affiliation. (D. Exhibit 72, Rodríguez' Deposition, pg. 67, lines 19-24, pg. 68, lines 2-5, pg.69, lines 1-3).

139.  Plaintiff Rodríguez was the School Director of the Rafael Hernández Marín School until December 2012.  On January 3, 2013, he was appointed to the trust position of Regional Director for Arecibo with a salary of $5,852.00 (D.

Exhibit 72, Rodríguez' Deposition, pg. 18, lines 7-12, D. Exhibit 93, Dept. of Education's Certification).

140.   Defendant Román never asked any of the candidates' political affiliation in the interviews she participated in. (S. Exhibit 98, Román's Statement under Penalty of Perjury, #14 lines 1-2).

## The Eligibility Certifications

141.   The Recruitment Division of the Secretariat for Human Resources at the central level provides the certification for eligible candidates. The Division places the candidates in descending scores. The criteria for the final scores are calculated considering:

a.   candidate's residence;

b.   years of experience;

c.   academic point average;

d.   academic level of preparation;

e.   physical handicap;

f.   whether he/she is a veteran.

The scores are then tabulated and assigned by the Division. (D. Exhibit 98, Román's Statement under Penalty of Perjury, #11 lines 3-9).

142.   In the case of the position of Auxiliary Superintendent, the members of the committee are: (1) a representative of the Under Secretary of Academic Affairs; (2) School Superintendent where the position is available and; (3) the

Regional Director of the School District where the position is available. (D. Exhibit 98, Román's Statement under Penalty of Perjury #12 lines 2-5).

143.   The interview process consists of two parts: one oral and one written. The president of the interviewing committee consults with the eligible candidates whether they prefer the oral part be conducted in a group or individually. The committee then carries out this part of the process as agreed upon by the candidates.   The same questions are asked of the candidates irrespective of whether they are interviewed in a group or individually. The questions are geared to identify their educational background and experience, residency, why they want to be considered for the position and where they are working at the time of the interview. (D. Exhibit 98, Román's Statement under Penalty of Perjury, # 13 lines 1-9).

144.   The second part of the interview is written, and may include one (1) or two (2) questions prepared by the Regional Director.   Each candidate answers the same questions individually within the allotted time.   (D. Exhibit 98, Román's Statement under Penalty of Perjury, #13 lines 9-12).

145.   On the same day as the interviews are held, the committee meets to read the answers.   Each member reads the answers and the committee reviews the answers to the questions in terms of context and grammatical errors and grades them using a scale 1 to 5. They then decide which  candidates will be recommended to the Secretary of Education. (D. Exhibit 98, Román's Statement under Penalty of Perjury, #15, lines 1-5).

146. The Secretary makes the final decision of what recommended candidate gets ultimately appointed.  None of the committee members have any authority in the decision making process of the Secretary's final choice. (D. Exhibit 98, Román's Statement under Penalty of Perjury, # 15 lines 5-7; D. Exhibit 97, Statement under Penalty of Perjury Rivera #23 lines 5-6).

147. Defendant Rivera did not participate in the process of certifying eligible candidates to the position of Auxiliary Superintendent performed by the Recruitment Division. (D. Exhibit 97, Statement under Penalty of Perjury Rivera #23 lines 1-3).

148. Defendant Rivera did not participate in the interviews conducted for the position of Auxiliary Superintendents.  The interviews were performed by a interviewing and evaluating committee, which then made recommendations to him. (Exhibit 97, Statement under Penalty of Perjury Rivera #23 lines 2-5).

149. For the years 2010 and 2011, the Department of Education issued two (2) certifications of candidates for the position of School Superintendent in the Guayama District, A-11403. (D. Exhibit 22, Certification of Certifications of Eligible Candidates for Superintendent in the Guayama District; D. Exhibit 23, Certification Eligible Candidates certified on November 4, 2010; D. Exhibit 24, Certification Eligible Candidates certified on  May 17, 2011).

150. Plaintiff Del Valle was not certified as an eligible candidate for a position of Superintendent in the Guayama District on November 18, 2010, but was certified as an eligible candidate for a position of Superintendent on May 17,

2011.  (D. Exhibit 23 and 24, Certification Eligible Candidates certified November 4, 2010 and May 17, 2011).

151.  For the May 17, 2011 certification, the interviewing and evaluating committee recommended Griselle Hernández Batalla, Ana I. Betancourt and Del Valle, in that order.  Defendant Rivera picked Betancourt for the position. (D. Exhibit 97, Statement under Penalty of Perjury Rivera #24 lines 3-5).

152.  Defendant Rivera knew of Betancourt's competency and dedication to education. She had a doctorate in education, and her scoring rank denoted her years of preparation and experience. Defendant Rivera had worked with Betancourt before and they had studied together in the doctorate program. (D. Exhibit 97, Statement under Penalty of Perjury Rivera  #24 lines 4-8).

153.  Plaintiff Del Valle had the lowest score of all the ten (10) candidates in the certification issued on May 17, 2011. (D. Exhibit 24, Certification Eligible Candidates certified May 17, 2011.)

154.  Defendant Román was not a member of the interviewing committee for the Certification of Eligible Candidates for Guayama who were certified on May 17, 2011. (D. Exhibit 24, Certification Eligible Candidates certified May 17, 2011.)

155.  For the years 2010 and 2011, the Department of Education issued two (2) certifications for positions of Auxiliary Superintendent for the Bayamón District.  A Certification of Eligible Candidates was certified on November 8, 2010  for  four  (4)  Auxiliary  Superintendent  positions:

A11400-F80069-F80074-R86034. The other Certification of Eligible Candidates was certified on September 16, 2011 for Auxiliary Superintendent position-F80083. (D. Exhibit 25, Certification of Certifications of Eligible Candidates for Auxiliary Superintendents in the Bayamón, Vega Alta and Manatí Districts; D. Exhibit 26, Certification of Eligible Candidates certified on November 8, 2010; (D. Exhibit 24, Certification Eligible Candidates certified May 17, 2011.)

156. Plaintiffs Del Valle and Rodríguez Ramos were certified as eligible candidates for an Auxiliary Superintendent position in the Bayamón District in the certification issued on November 8, 2010. (D. Exhibit 26, Certification Eligible Candidates certified November 8, 2010.)

157. Plaintiff Del Valle was candidate #34 with a score of fifty-seven (57) in the certification issued in November 8, 2010 for four (4) positions of Auxiliary Superintendent for the Bayamón District. (D. Exhibit 26, Certification Eligible Candidates certified November 8, 2010.)

158. Plaintiff Rodríguez was candidate #21 with a score of sixty-two (62) in the certification issued on November 8, 2010 for four (4) positions of Auxiliary Superintendent for the Bayamón District. (D. Exhibit 26, Certification Eligible Candidates certified November 8, 2010.)

159. The candidates approved for the four (4) positions of Auxiliary Superintendent for Bayamón were candidates certified with scores of seventy (70) (André Meléndez), 65 (José Torres Ortiz), 60 (Carmen Cruz) and 55

(Gloria Rivera).  (D. Exhibit 26, Certification Eligible Candidates certified November 8, 2010.)

160.   Defendant Román was a member of the interviewing committee for the Bayamón Certification of Eligible Candidates that were certified on November 8, 2010. (D. Exhibit 26, Certification Eligible Candidates certified November 8, 2010).

161.   Plaintiffs Del Valle and Rodríguez were not certified as eligible candidates for an Auxiliary Superintendent position for the Bayamón District in the certification issued September 16, 2011. (D. Exhibit 27, Certification Eligible Candidates certified September 16, 2011).

162.   For the 2010, 2011, and 2012 years, the Department of Education issued four (4) certifications for Auxiliary Superintendent positions in the Vega Alta School District. A Certification of Eligible Candidates was certified on November 8, 2010 for three (3) Auxiliary Superintendent positions: F80053-F80054-F80059. Certification of Eligible Candidates was certified on May 10, 2011 for one Auxiliary Superintendent position – F80054. Certification of Eligible Candidates was certified on February 15, 2012 for one Auxiliary Superintendent position – F80054. Certification of Eligible Candidates was certified on November 20, 2012 for one Auxiliary Superintendent position – R00187. (D. Exhibit 25, Certification of Certifications of Eligible Candidates for Auxiliary Superintendent Bayamón, Vega Alta and Manatí Districts; D. Exhibit 28, Certification of Eligible

Candidates certified on November 8, 2010; D. Exhibit 29, Certification Eligible Candidates certified on May 10, 2011; D. Exhibit 30, Certification Eligible Candidates certified on February 15, 2012; D. Exhibit 31, Certification Eligible Candidates certified on November 20, 2012).

163. Plaintiff Del Valle was not a certified as an eligible candidate for the positions of Auxiliary Superintendent in the four (4) certifications issued for the Vega Alta School District in the years 2010, 2011 and 2012. (D. Exhibit 25, Certification of Certifications of Eligible Candidates for Auxiliary Superintendents for Bayamón, Vega Alta and Manatí Districts; D. Exhibit 28, Certification of Eligible Candidates certified on November 8, 2010; D. Exhibit 29, Certification Eligible Candidates certified May 10, 2011; D. Exhibit 30, Certification Eligible Candidates certified February 15, 2012; D. Exhibit 31, Certification Eligible Candidates certified November 20, 2012).

164. Plaintiff Rodríguez was certified as an eligible candidate for an Auxiliary Superintendent position at the Vega Alta School District in the certification issued on November 8, 2010. (D. Exhibit 28, Certification Eligible Candidates certified on November 8, 2010.)

165. Plaintiff Rodríguez was ranked candidate #15 with a score of sixty-two (62) in the certification issued for Vega Alta on November 8, 2010 for three (3) positions of Auxiliary Superintendent. (D. Exhibit 28, Certification Eligible Candidates certified November 8, 2010.)

166.  The final candidates approved for the three (3) positions of Auxiliary Superintendent for Vega Alta were candidates certified with scores of seventy (70) (Carmen Gómez), 60 (Lourdes Heyliger), and 60 (Marisol Valderrama). (D. Exhibit 28, Certification Eligible Candidates certified on November 8, 2010.)

167.  Defendant Rivera approved the candidates for each of the three (3) positions for Vega Alta Auxiliary Superintendent, in the order in which they were recommended by the interviewing and evaluating committee. (D. Exhibit 97, Statement under Penalty of Perjury Rivera #25 lines 1-9; D. Exhibit 28, Certification Eligible Candidates certified November 8, 2010).

168.  Plaintiff Rodríguez was recommended as a second choice for one of the three positions.  Carmen Gómez Pabón was the committees' first choice, and who was ultimately selected by Secretary Rivera. (D. Exhibit 97, Statement under Penalty of Perjury Rivera #25 lines 7-9).

169.  Defendant Román was not a member of the interviewing committee for the Vega Alta Certification of Eligible Candidates certified on November 8, 2010. (D. Exhibit 28, Certification Eligible Candidates certified on November 8, 2010).

170.  Defendant Rivera did not know Marisol Valderrama, Lourdes Heyliger, or Carmen Pabón at the time he approved their candidacies. (D. Exhibit 97, Statement under Penalty of Perjury Rivera #25 lines 9-10; D. Exhibit 28, Certification Eligible Candidates certified November 8, 2010.)

171. Plaintiff Rodríguez was candidate #10 with a score of sixty-two (62) in the certification issued on May 10, 2011 for the Vega Alta Auxiliary Superintendent-F80054, the candidate with the lowest score . (D. Exhibit 29, Certification Eligible Candidates certified May 10, 2011.)

172. Plaintiff Rodríguez was not certified as a candidate eligible for a position as Auxiliary Superintendent at Vega Alta District in the certifications issued February 15, 2012 and November 20, 2012. (Exhibit 30, Certification Eligible Candidates certified February 15, 2012; Exhibit 31, Certification Elegible Candidates certified November 20, 2012).

173. For the years 2010, 2011 and 2012, the Department of Education issued two (2) certifications for the Auxiliary Superintendent position for the Manatí School District. A Certification of Eligible Candidates was certified on November 8, 2010 for three (3) positions of Auxiliary Superintendent: F80037-F80038-F80039.  Certification of Eligible Candidates was certified on November 20, 2012 for the position of Auxiliary Superintendent-R00219. (D. Exhibit 25, Certification of Certifications of Eligible Candidates for Auxiliary Superintendent for the Bayamón, Vega Alta and Manatí Districts; D. Exhibit 32, Certification of Eligible Candidates certified on November 8, 2010; D. Exhibit 33, Certification Eligible Candidates certified November 20, 2012 .)

174. Plaintiff Del Valle was not a certified as an eligible candidate for the position of Auxiliary Superintendent in the two (2) certifications issued for the Manatí

School District for the years 2010, 2011 and 2012. (D. Exhibit 25, Certification of Certifications of Eligible Candidates for Auxiliary Superintendent for the Bayamón, Vega Alta and Manatí Districts; D. Exhibit 32, Certification of Eligible Candidates certified on November 8, 2010; D. Exhibit 33, Certification Eligible Candidates certified November 20, 2012).

175.   Plaintiff Rodríguez was certified as an eligible candidate for a position of Auxiliary Superintendent at the Manatí School District in the certification issued November 8, 2010 and was candidate #11 with a score of 62. (Exhibit 32, Certification Eligible Candidates certified November 8, 2010.)

176.   The final candidates approved for the three (3) positions of Auxiliary Superintendent were candidates certified with scores of 75 (Carmen Santiago), 55 (Carmen L. Maysonet), and 59 (Luz D. Torres). (D. Exhibit 32, Certification Eligible Candidates certified November 8, 2010.)

177.   Defendant Román was not a member of the interviewing committee in the Certification of Eligible Candidates that was certified on November 8, 2010. (D. Exhibit 32, Certification Eligible Candidates certified November 8, 2010.)

178.   Plaintiff Rodríguez was not certified as an eligible candidate for Auxiliary Superintendent for the Manatí District in the November 20, 2012. (D. Exhibit 33, Certification Eligible Candidates certified February 15, 2012; D. Exhibit 31, Certification Eligible Candidates certified November 20, 2012).

179.   After the school district reorganization, the San Juan region was comprised of San Juan District I, San Juan District II, Carolina District and Guaynabo

District. (D. Exhibit 34, Letter June 25, 2010 Reorganization District and attachment-Distribution of Schools Districts).

180.   For the years 2010 and 2011, the Department of Education issued three (3) certifications for the Auxiliary Superintendent position in the  San Juan District.  A Certification of Eligible Candidates was certified on November 10, 2010 for eleven (11) Auxiliary Superintendent positions: T9675-F80406-F80424-F80407-F80408-F80409-R86229-F80428-F80425-F80422-F80423. Certification of Eligible Candidates was certified on May 12, 2011 for five (5) of Auxiliary Superintendent positions - F80428-F80422-F80423-F80425-F86229.  Certification of Eligible Candidates was certified on September 21, 2011 for two (2) Auxiliary Superintendent positions - R00302-R86229. (D. Exhibit 35, Certification of Certifications of Eligible Candidates for Auxiliary Superintendent for the Schools Region of San Juan, Bayamón, Caguas and Humacao; D. Exhibit 36, Certification of Eligible Candidates  San Juan District certified on November 10, 2010; D. Exhibit 37, Certification Eligible Candidates San Juan District certified on May 12, 2011; D. Exhibit 38, Certification Eligible Candidates San Juan District certified on September 21, 2011).

181.   Plaintiff Del Valle was certified as candidate eligible for an Auxiliary Superintendent position for the San Juan School District in the certification issued on November 10, 2010.  (D. Exhibit 36, Certification Eligible Candidates certified November 10, 2010.)

182. Plaintiff Del Valle was candidate #50 with a score of fifty-seven (57) for the certification issued on November 10, 2010 for eleven (11) Auxiliary Superintendent positions. (D. Exhibit 36, Certification Eligible Candidates certified November 10, 2010.)

183. The candidates approved for seven (7) of the eleven (11) Auxiliary Superintendent positions were candidates certified with scores of seventy (70) (Iris M. Jusino), 65 (Ivette Santos), 65 (Lizzette De Jesús), 57 (Jesús D. Santiago), 55 (Elizabeth Martínez), 50 (Sonia Rivera) and 48 (Marie S. Cabán). (D. Exhibit 36, Certification Eligible Candidates certified November 10, 2010.)

184. Defendant Román was not a member of the interviewing committee of the Certification of Eligible Candidates certified on November 10, 2010. (D. Exhibit 36, Certification Eligible Candidates certified on November 10, 2010).

185. Plaintiff Del Valle was certified as candidate eligible for a position of Auxiliary Superintendent in the San Juan School District for the certification issued on May 12, 2011. (D. Exhibit 37, Certification Eligible Candidates certified on May 12, 2011.)

186. Plaintiff Del Valle was candidate #27 with a score of fifty-seven (57) in the certification issued on May 12, 2011 for five (5) Auxiliary Superintendent positions. (D. Exhibit 37, Certification Eligible Candidates certified on May 12, 2011.)

187.    The candidates approved for four (4) of the five (5) Auxiliary Superintendent positions were candidates certified with scores of 69 (Lydia Báez), 57 (Awilda Barreto), 55 (Migdalia Torres) and 51 (José Irizarry). (D. Exhibit 37, Certification Eligible Candidates certified May 12, 2011.)

188.    Defendant Román was not a member of the interviewing committee of the Certification of Eligible Candidates that was certified on May 12, 2011. (D. Exhibit 37, Certification Eligible Candidates certified May 12, 2011).

189.    Plaintiffs Del Valle and Rodríguez were not certified as eligible candidates for the position of Auxiliary Superintendent in the certifications issued on September 21, 2011. (D. Exhibit 38, Certification Eligible Candidates certified September 21, 2011).

190.    Plaintiff Rodríguez was not certified as eligible candidate for a position of Auxiliary Superintendent in the certifications issued on November 10, 2010 and May 12, 2011. (D. Exhibit 36, Certification Eligible Candidates certified November 10, 2010; Exhibit 37, Certification Eligible Candidates certified May 12, 2011).

191.    For the years 2010 and 2011, the Department of Education issued one (1) certification for the position of Auxiliary Superintendent in the Carolina School District. Certification of Eligible Candidates was certified on November 10, 2010 for four (4) positions of Auxiliary Superintendent: F80375-F80376-F80329-F80410. (D. Exhibit 35, Certification of Certifications of Eligible Candidates for Auxiliary Superintendent for the San

Juan, Bayamón, Caguas and Humacao regions; D. Exhibit 39, Certification of Eligible Candidates Carolina School District certified on November 10, 2010).

192.   Plaintiffs Del Valle and Rodríguez were not certified eligible candidates for the four (4) Auxiliary Superintendent positions certified for the Carolina School District on November 10, 2010. (D. Exhibit 39, Certification Eligible Candidates certified November 10, 2010).

193.   For the years 2010 and 2011, the Department of Education issued three (3) certifications for the Auxiliary Superintendent positions in the Guaynabo School District. Certification of Eligible Candidates was certified on November 10, 2010 for seven (7) Auxiliary Superintendent positions: F80390-F80391-F80411-F80392-F80393-F80398-T96752. Certification of Eligible Candidates was certified on May 12, 2011 for one (1) position of Auxiliary Superintendent F80422. Certification of Eligible Candidates was certified on September 21, 2011 for Auxiliary Superintendent position T96752. (D. Exhibit 35, Certification of Certifications of Eligible Candidates for Auxiliary Superintendents for San Juan, Bayamón, Caguas and Humacao regions; D. Exhibit 40, Certification of Eligible Candidates Guaynabo School District certified on November 10, 2010; D. Exhibit 41, Certification of Eligible Candidates Guaynabo School District certified on May 12, 2011; D. Exhibit 42, Certification of Eligible Candidates Guaynabo School District certified on September 21, 2011).

194.    Plaintiffs Del Valle and Rodríguez were not certified as eligible candidates for the Auxiliary Superintendent position certified for the Guaynabo District on November 10, 2010, May 12, 2011 and September 21, 2011. (D. Exhibit 40, Certification Eligible Candidates certified November 10, 2010; D. Exhibit 41, Certification Eligible Candidates certified May 12, 2011; D. Exhibit 42, Certification Eligible Candidates certified September 21, 2011).

195.    After the Reorganization of Schools Districts, the School Region of Bayamón was comprised of Bayamón School District, Toa Baja School District (Toa Alta, Toa Baja and Cataño), Naranjito (Naranjito and Corozal), Orocovis (Morovis and Orocovis). (D. Exhibit 34, Letter June 25, 2010 Reorganization District and attachment-Distribution of Schools Districts).

196.    For the years 2010 and 2011, the Department of Education issued two (2) certifications for the position of Auxiliary Superintendent in the Toa Baja School District. Certification of Eligible Candidates was certified on November 8, 2010 for three (3) Auxiliary Superintendent positions: F80100-F80101-F80102. Certification of Eligible Candidates was certified on September 16, 2011 for two (2) Auxiliary Superintendent positions: R53986-F90166. (D. Exhibit 35, Certification of Certifications of Eligible Candidates for Auxiliary Superintendent for the San Juan, Bayamón, Caguas and Humacao regions; Exhibit 43, Certification of Eligible Candidates Toa Baja School District certified on November 8, 2010; D. Exhibit 44,

Certification of Eligible Candidates Toa Baja School District certified on September 16, 2011).

197. Plaintiffs Del Valle and Rodríguez were not certified as eligible candidates for the position of Auxiliary Superintendent certified for the Toa Baja District on November 8, 2010 and September 16, 2011. (D. Exhibit 43, Certification Eligible Candidates certified November 8, 2010; D. Exhibit 44, Certification Eligible Candidates certified September 16, 2011).

198. For the years 2010 and 2011, the Department of Education issued two (2) certifications for the position of Auxiliary Superintendent in the Corozal School District. Certification of Eligible Candidates was certified on November 18, 2010 for five (5) Auxiliary Superintendent positions: F80084-F80085-F80086-F80087-F80092. Certification of Eligible Candidates was certified on September 16, 2011 for two (2) positions of Auxiliary Superintendent - F70118-R00266. (D. Exhibit 35, Certification of Certifications of Eligible Candidates for Auxiliary Superintendent for the San Juan, Bayamón, Caguas and Humacao region; D. Exhibit 45, Certification of Eligible Candidates Corozal School District certified on November 18, 2010; D. Exhibit 46, Certification of Eligible Candidates Corozal School District certified on September 16, 2011) .

199. Plaintiffs Del Valle and Rodríguez were not certified as eligible candidates for the position of Auxiliary Superintendent certified for the Corozal School District on November 18, 2010 and September 16, 2011.  (D. Exhibit 45,

Certification Eligible Candidates certified November 18, 2010; D. Exhibit 46,

Certification Eligible Candidates certified September 16, 2011).

200.   For the years 2010 and 2011, the Department of Education issued two (2)
certifications for the Auxiliary Superintendent positions for the Orocovis
School District. Certification of Eligible Candidates was certified on
November 8, 2010 for four (4) Auxiliary Superintendent positions:
F80115-F80116-F80117-R86054. Certification of Eligible Candidates was
certified on March 10, 2011 for one (1) position of Auxiliary Superintendent-
F80117. (D. Exhibit 35, Certification of Certifications of Eligible Candidates
for Auxiliary Superintendents for the San Juan, Bayamón, Caguas and
Humacao region; D. Exhibit 47, Certification of Eligible Candidates Orocovis
School District certified on November 8, 2010; D. Exhibit 48, Certification of
Eligible Candidates Orocovis School District certified on March 10, 2011).

201.   Plaintiff Del Valle was not certified as an eligible candidate for the position
of Auxiliary Superintendent certified for the Orocovis School District on
November 8, 2010 and March 10, 2011. (D. Exhibit 47, Certification Eligible
Candidates certified November 8, 2010; D. Exhibit 48, Certification Eligible
Candidates certified March 10, 2011).

202.   Plaintiff Rodríguez was certified as an eligible candidate for an Auxiliary
Superintendent position at the Orocovis School District for the certification
issued November 8, 2010. (D. Exhibit 47, Certification Eligible Candidates
certified November 8, 2010.)

203. Plaintiff Rodríguez was candidate #7 with a score of sixty-two (62) in the certification issued on November 8, 2010 for four (4) Auxiliary Superintendent positions. (D. Exhibit 47, Certification Eligible Candidates certified November 8, 2010.)

204. The candidates recommended for three (3) of the four (4) positions of Auxiliary Superintendent were candidates certified with scores of fifty-five (55) (Nora Maldonado), 50 (José Vega), and 48 (Annette Colón). (D. Exhibit 47, Certification Eligible Candidates certified November 8, 2010.)

205. Defendant Román was a member of the interviewing committee in the Certification of Eligible Candidates certified November 8, 2010. (D. Exhibit 47, Certification Eligible Candidates certified November 8, 2010).

206. Plaintiff Rodríguez was candidate #2 with a score of sixty-two (62) in the certification issued in March 10, 2011 for the position of Auxiliary Superintendent-F80117 for the Orocovis School District. (D. Exhibit 48, Certification Eligible Candidates certified March 10, 2011.)

207. Plaintiff Rodríguez excused himself from the interview. (D. Exhibit 48, Certification Eligible Candidates certified March 10, 2011.)

208. After the school district reorganization, the Caguas school region was composed of Barranquitas School District, Cidra School District, Gurabo School District and Guayama School District. (D. Exhibit 34, Letter June 25, 2010 Reorganization District and attachment-Distribution of Schools Districts).

Luis Rodríguez Ramos, et al. v. Department of Education, et al.
Civil No. 11-1653 (CVR)
Opinion and Order
Page 60

209.   For the years 2010 and 20911, the Department of Education issued three (3) certifications for the Auxiliary Superintendent position at the Guayama School District. Certification of Eligible Candidates was certified on November 9, 2010 for three (3) Auxiliary Superintendent positions: F80163-F80164-F80165.  Certification of Eligible Candidates was certified on March 23, 2011 for three (3) Auxiliary Superintendent positions: F80163-F80164-F80165. Certification of Eligible Candidates was certified on October 31, 2011 for three (3) Auxiliary Superintendent positions: F75220-F80170-T01059. (D. Exhibit 35, Certification of Certifications of Eligible Candidates for Auxiliary Superintendents for the San Juan, Bayamón, Caguas and Humacao regions; D. Exhibit 49, Certification of Eligible Candidates Guayama School District certified on November 9, 2010; D. Exhibit 50, Certification of Eligible Candidates Guayama School District certified on March 23, 2011; D. Exhibit 51, Certification of Eligible Candidates Guayama School District certified on October 31, 2011).

210.   Plaintiff Del Valle was certified as an eligible candidate for the certification issued on November 9, 2010, but he is shown as "excused". (D. Exhibit 49, Certification of Eligible Candidates certified November 9, 2010).

211.   Plaintiff Del Valle was not certified as an eligible candidate for the Auxiliary Superintendent positions certified for the Guayama School District on March 23, 2011 and October 31, 2011. (D. Exhibit 50, Certification Eligible

Candidates certified March 23, 2011; D. Exhibit 51, Certification Eligible Candidates certified October 31, 2011).

212.   Plaintiff Rodríguez was not certified as an eligible candidate for the Auxiliary Superintendent positions certified for the Guayama School District on November 9, 2010, March 23, 2011 and October 31, 2011. (D. Exhibit 49, Certification Eligible Candidates certified November 9, 2010; D. Exhibit 50, Certification Eligible Candidates certified March 23, 2011; D. Exhibit 51, Certification Eligible Candidates certified October 31, 2011).

213.   For the years 2010 and 2011, the Department of Education issued one (1) certification for the Auxiliary Superintendent positions at the Gurabo School District.  Certification of Eligible Candidates was certified on June 3, 2011 for three (3) Auxiliary Superintendent positions: F80178-F80177-F75219. (D. Exhibit 35, Certification of Certifications of Eligible Candidates for Auxiliary Superintendent for the San Juan, Bayamón, Caguas and Humacao school regions; D. Exhibit 52, Certification Elegible Candidates for the Gurabo School District certified on June 3, 2011).

214.   Plaintiffs Del Valle and Rodríguez were not certified as eligible candidates for the Auxiliary Superintendent positions certified for the Gurabo School District on June 3, 2011. (D. Exhibit 52, Certification Eligible Candidates certified June 3, 2011).

215.   For the years 2010 and 2011, the Department of Education issued one (1) certification for the Auxiliary Superintendent position for the Cidra School

District. Certification of Eligible Candidates was certified on November 9, 2010 for one (1) position of Auxiliary Superintendent: F80150. (D. Exhibit 35, Certification of Certifications of Eligible Candidates for Auxiliary Superintendents for the San Juan, Bayamón, Caguas and Humacao school regions; D. Exhibit 53, Certification Eligible Candidates Cidra School District certified on November 9, 2010).

216. Plaintiffs Del Valle and Rodríguez were not certified as eligible candidates for the Auxiliary Superintendent positions certified for the Cidra School District on November 9, 2010. (D. Exhibit 53, Certification Eligible Candidates certified November 9, 2010).

217. For the years 2010 and 2011, the Department of Education issued one (1) certification for the Auxiliary Superintendent positions for the Barranquitas School District. Certification of Eligible Candidates was certified on November 9, 2010 for three (3) Auxiliary Superintendent positions: F80133-F80134-F80135. (D. Exhibit 35, Certification of Certifications of Eligible Candidates for Auxiliary Superintendents for the  San Juan, Bayamón, Caguas and Humacao school regions; D. Exhibit 54, Certification Eligible Candidates Cidra School District certified on November 9, 2010).

218. Plaintiffs Del Valle and Rodríguez were not certified as eligible candidates for the Auxiliary Superintendent positions certified for the Barranquitas School District on November 9, 2010. (D. Exhibit 54, Certification Eligible Candidates certified November 9, 2010).

219.   After the reorganization of schools districts, the Humacao School Region was composed of: Yabucoa School District, Las Piedras School District, Fajardo School District and Canóvanas School District. (D. Exhibit 34, Letter June 25, 2010 Reorganization District and attachment-Distribution of Schools Districts).

220.   For the years 2010 and 2011, the Department of Education issued two (2) certifications for the Auxiliary Superintendent position at the Las Piedras School District. Certification of Eligible Candidates was certified on November 12, 2010 for three (3) Auxiliary Superintendent positions: F80222-F80223-F80224.  Certification of Eligible Candidates was certified on May 11, 2011 for one (1) position of Auxiliary Superintendent – F00048. (D. Exhibit 35, Certification of Certifications of Eligible Candidates for Auxiliary Superintendents for the San Juan, Bayamón, Caguas and Humacao regions; D. Exhibit 55, Certification of Eligible Candidates Las Piedras School District certified on November 12, 2010; D. Exhibit 56, Certification of Eligible Candidates Las Piedras School District certified on May 11, 2011).

221.   Plaintiffs Del Valle and Rodríguez were not certified as eligible candidates for the Auxiliary Superintendent positions certified for Las Piedras School District on November 12, 2010 and May 11, 2011. (D. Exhibit 55, Certification Eligible Candidates certified November 12, 2010; D. Exhibit 56, Certification Eligible Candidates certified May 11, 2011).

222. For the years 2010 and 2011, the Department of Education issued two (2) certifications for Auxiliary Superintendent position for the Fajardo School District. Certification of Eligible Candidates was certified on November 12, 2010 for three (3) Auxiliary Superintendent positions: F80207-F80208-F80209. Certification of Eligible Candidates was certified on May 12, 2011 for two (2) Auxiliary Superintendent positions-F00051-F90107. (D. Exhibit 35, Certification of Certifications of Eligible Candidates for Auxiliary Superintendents for the San Juan, Bayamón, Caguas and Humacao regions; D. Exhibit 57, Certification of Eligible Candidates Fajardo School District certified on November 12, 2010; D. Exhibit 58, Certification of Eligible Candidates Fajardo School District certified on May 12, 2011).

223. Plaintiffs Del Valle and Rodríguez were not certified as eligible candidates for the Auxiliary Superintendent positions certified for the Fajardo School District on November 12, 2010 and May 12, 2011. (D. Exhibit 57, Certification Eligible Candidates certified November 12, 2010; D. Exhibit 58, Certification Eligible Candidates certified May 12, 2011).

224. For the years 2010 and 2011, the Department of Education issued one (1) certification for the Auxiliary Superintendent position for the Canóvanas School District. Certification of Eligible Candidates was certified on November 12, 2010 for three (3) of Auxiliary Superintendent positions: F80192-F80193-F80194. (D. Exhibit 35, Certification of Certifications of

Eligible Candidates for Auxiliary Superintendents for the San Juan, Bayamón, Caguas and Humacao regions; D. Exhibit 59, Certification of Eligible Candidates Canóvanas School District certified on November 12, 2010).

225.   Plaintiffs Del Valle and Rodríguez were not certified as eligible candidates for the Auxiliary Superintendent positions certified for the Canóvanas School District on November 12, 2010. (D. Exhibit 59, Certification Eligible Candidates certified November 12, 2010).

226.   For the years 2010 and 2011, the Department of Education issued two (2) certifications for the Auxiliary Superintendent position for the Yabucoa School District. Certification of Eligible Candidates was certified on November 12, 2010 for three (3) Auxiliary Superintendent positions: F80239-F80240-F80241.  Certification of Eligible candidates was certified on May 12, 2011 for four (4) Auxiliary Superintendent positions: F80239-F80240-F80241-R0032.    (D. Exhibit 35, Certification of Certifications of Eligible Candidates for Auxiliary Superintendents for the San Juan, Bayamón, Caguas and Humacao regions; D. Exhibit 60, Certification of Eligible Candidates Yabucoa School District certified on November 12, 2010; D. Exhibit 61, Certification of Eligible Candidates Yabucoa School District certified on May 12, 2011).

227.   Plaintiff Del Valle had the lowest score of the thirty (30) eligible candidates of the certification certified on November 12, 2010 for three (3) Auxiliary

Superintendent positions in Yabucoa. (D. Exhibit 60, Certification of Eligible Candidates November 12, 2010).

228.   The interviewing committee did not recommend any of the candidates certified in the certification issued November 12, 2010. The certification indicates that Plaintiff Del Valle was interviewed. Co-Defendant Román was not a member of the committee. (D. Exhibit 60, Certification of Eligible Candidates November 12, 2010).

229.   Plaintiff Del Valle was marked as a "no-show" at the interview for the certification of eligible candidates certified on May 12, 2011 for the Auxiliary Superintendent position for the Yabucoa District. (D. Exhibit 61, Certification of Eligible Candidates May 12, 2011).

230.   Plaintiff Rodríguez was not certified as an eligible candidate for the Auxiliary Superintendent position certified for Yabucoa School District on November 12, 2010 and May 12, 2011. (D. Exhibit 60, Certification Eligible Candidates certified November 12, 2010; D. Exhibit 61, Certification Eligible Candidates certified May 12, 2011).

## Department of Education Regulations

231.   Regulation No. 6743, the Regulation for Teaching Personnel of the Department of Education, pertains to the human resources area of the Department. (P. Exhibit C).

232.   Teaching Personnel who do not approve the probationary period and had been employed in teaching personnel position with permanent status in

another category, will be entitled to be reinstated in a position in the same category that he had occupied on a permanent basis or in another position for which requirements are analogous. (See P. Ex D. Art. VI Section 2(7), pg. 26 at Dkt. 131-4).

233. Article VII mentions both Superintendents and Auxiliary Superintendents. See P. Ex. D pg. 26).

234. When notifying of a transfer, relocation or reassignment, a right to appeal must be notified to the employee. (See P. Ex. D Art. VIII, Sec. 3(3)(g) pg. 39).

235. Reentry is the right of a career service employee who voluntarily resigns or was laid off for lack of funds, elimination of positions, programs or departments, to be considered for employment in the position or positions he performed with permanent status. (See P. Ex. D, art. X, Sec. 1, pg. 42).

**LEGAL ANALYSIS**

Defendants premise their request for dismissal of Plaintiffs' claims on a variety of defenses to wit: 1) time bar as to the acts that occurred prior to July 11, 2010; 2) lack of a causal connection between Defendants' acts and Plaintiffs' circumstances; 3) failure to show political affiliation as a substantial or motivating factor in the decision-making process; 4) the equal protection claims fall within Plaintiffs' First Amendment claims and must therefore be dismissed; 5) no violation of Plaintiffs' due process rights occurred as a pre-termination hearing was unnecessary because the reorganization exception applies; 6) Defendants are entitled to qualified immunity. The Court addresses each of these claims in turn.

### A.    Time Bar.

Defendants allege that Plaintiffs' claims arising before July 11, 2010 are time-barred, since the Complaint was filed July 11, 2011. Therefore, they occurred before the one year mark from the date the complaint was filed.  Plaintiffs aver the continuing violation doctrine applies, since they were discriminated against from 2009 continuously until after the Complaint was filed.  The Court agrees with Defendants that any claims before July 10, 2010 are time-barred.

It is well settled that section 1983 does not provide a statute of limitations. Rodríguez Torres v. Muñiz González, 898 F.Supp.2d 433, 436 (D. Puerto Rico 2012). However, the Supreme Court has previously held that courts must borrow the State's limitations period governing personal injury actions. See, Wilson v. García, 471 U.S. 261, 266 (1985). Thus, state law statutes of limitations govern suits in federal courts arising under Section 1983, which is one (1) year. Benítez-Pons v. Com. of Puerto Rico, 136 F.3d 54, 59 (1st Cir. 1998.); P.R. Laws Ann., tit. 31, § 5141; see also Carreras-Rosa v. Alves-Cruz, 127 F.3d 172, 174 (1st Cir. 1997).  Therefore, the one-year personal injury statute of limitations in tort actions governs section 1983 claims.  See, Rodríguez-García v. Municipality of Caguas, 354 F.3d 91, 96 (1st Cir. 2004).

While state law determines the prescriptive period, it is federal law that determines the date on which the claim accrued.  Rivera-Muriente v. Agosto-Alicea, 959 F.2d 349, 353 (1st Cir. 1992).  It has been held time and again that the limitations period begins to run "one day after accrual", which is the date when a plaintiff "knows or has reason to know of

the injury which is the basis for his claim." Benítez-Pons, 136 F.3d at 59; Rodríguez-García, 354 F.3d at 96–97.

Therefore, Defendants allege, since Plaintiffs filed their complaint on July 11, 2011, any acts that occurred over the one year mark before that date – that is, July 11, 2010- are time-barred.  Plaintiffs aver their allegations fall under the continuing violation doctrine and are therefore protected.

The continuing violation doctrine is an exception to the statute of limitations that applies if an act, which would otherwise be time-barred, is deemed to be part of an ongoing series of discriminatory acts, and there is "some violation within the statute of limitations period that anchors the earlier claim[ ]." O'Rourke v. City of Providence, 235 F.3d 713, 730 (1st Cir. 2001). When there is a substantial relationship between the timely and untimely claims, the claims can be viewed as a continuing violation, and the untimely claim can be included in the complaint. See, Sabree v. United Broth. of Carpenters and Joiners Local No. 33, 921 F.2d 396, 401 (1st Cir. 1990).  In order to be able to determine whether there is a substantial relationship between the claims, the First Circuit Court of Appeals has held that the most important factor to examine is whether the plaintiff knew or should have known that she was being discriminated against at the time of the incident.  Id. at 402. "A knowing plaintiff has an obligation to file promptly or lose his [or her] claim." Id.

In the case at bar, the initial acts complained of occurred in July 2009 and ran through July 2010, as follows:

– Plaintiff Arroyo was a School Superintendent in Caguas and was appointed School Director in Caguas.

– Plaintiff Rosa was Auxiliary Superintendent for Title I in San Lorenzo and was appointed Auxiliary Superintendent in San Lorenzo.

– Plaintiff Rodríguez was Auxiliary Superintendent[7] in and was appointed School Director in Vega Baja.

– Plaintiff Del Valle was Auxiliary Superintendent in Bayamón and was appointed School Director in Bayamón.

As an initial matter, the Court notes that at the time these changes went into effect, co-Defendant Rivera was not the Secretary of Education. Co-Defendant Román herself was on administrative detail until January 19, 2010, when she began working as a Special Aide to the Under Secretary for Academic Affairs, at that time, co-Defendant Rivera. Co-Defendant Rivera only assumed a leadership position for the Department in July, 2010. Therefore, neither of them could have taken these allegedly discriminatory actions against Plaintiffs. This alone merits dismissing the causes of action during this period, since former Secretary Chardón, under whose leadership the administrative details actually occurred, is not a party in this action. Therefore, Plaintiffs' conclusory allegations that Defendants' goal "from beginning to end" was the removal of Plaintiffs from their career positions ring hollow.

A second reason for dismissal of the claims occurring before July 2010 is that the record is devoid of any discriminatory details ranging  from the short span of time from January 2010 when co-Defendant Román was appointed to a trust position, until co-

---

[7] Before occupying the positions of Auxiliary Superintendent on a probationary basis, both Plaintiff Del Valle and Rodríguez occupied the career, permanent positions of School Directors.  As will be discussed in more detail later, they did not finish their probationary period of two (2) years as Auxiliary Superintendent as they requested the "demotion" before the probationary period was up.

Defendant Rivera became Secretary in July, 2010, which is when Defendants aver the clock started ticking on Plaintiffs' claims. The Court can find no justification to explain what prevented Plaintiffs from filing their case after the alleged initial acts (the administrative detail on 2009) occurred. Although Plaintiffs very generally state that political discrimination occurred by these acts, the Court fails to see exactly how, as nothing in the record evidences or even implies this.

It is important to remember that Plaintiffs were not the only ones affected by the administrative detail, over three hundred (300) employees were sent on administrative detail, to cover the genuine need for positions to be filled by the beginning of the school year, and no allegation has been made that all the employees sent on detail were PDP members. Plaintiff Rosa remained in San Lorenzo on administrative detail with her same title and same salary. No one replaced her in her original position. She was reinstated to her same position in Yabucoa after the detail was over. Plaintiff Arroyo was sent to Caguas as School Director with her same salary. No one replaced her in her original position. She was reinstated to her previous position as School Superintendent in Gurabo, the next town over. After the detail ended, Plaintiffs Del Valle and Rodríguez had already submitted their voluntary demotion letters in October, 2009 and were reappointed School Directors after the leave terminated. All these actions began in July 2009, and ended in July 2010. A whole year went by, and Plaintiffs failed to bring forth their claims.

Even if the Court were to consider these actions a pattern of discrimination for the purposes of the continuing violation doctrine, it has been clearly established that doctrine is only available where a plaintiff was unaware of the discriminatory nature of otherwise

time-barred conduct at the time that it occurred.  <u>See</u>, <u>Windross v. Barton Protective Servs.,</u> <u>Inc</u>, 586 F.3d, 98, 103 (1st Cir. 2009) and <u>Williams v. Raytheron Co.</u>, 220 F.3d, 16, 21 (1st Cir. 2000).  Plaintiffs have failed to do so here.  They have proffered absolutely no evidence to establish how they were "unaware" that they were being discriminated against from the time the detail began in July 2009 until it ended in July 2010.  The Court therefore centers it analysis on the actions during the 2010-11 school year, specifically, from July 11, 2010 onwards, and finds that all claims before that date are time-barred.

**B.    First Amendment**.

It has been clearly established that the First Amendment's protection of the freedom of association prohibits government officials from taking adverse employment action against non-policymaking public employees due to the employee's political affiliation.  <u>See</u>, *e.g*., <u>Welch v. Ciampa</u>, 542 F.3d 927, 938 (1st Cir. 2008);  <u>see</u> <u>also</u>, <u>Rodríguez Marín v.</u> <u>Rivera González</u>, 438 F.3d 72, 75 (1st Cir. 2006) (collecting cases).  When evaluating a political discrimination claim, the Court uses the tripartite burden shifting test established by the Supreme Court in <u>Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle</u>, 429 U.S. 274, 287 (1977); <u>see</u> <u>also</u>, <u>Cruz-Báez, et. al. v. Negrón-Irizarry, et. al.</u>, 360 F.Supp.2d 326, 339 (D. Puerto Rico 2005).

First, a *prima facie* case of political discrimination based on the First Amendment must establish four elements: "(1) that the plaintiff and defendant have opposing political affiliations; (2) that the defendant is aware of the plaintiff's affiliation; (3) that an adverse employment action occurred; and (4) that political affiliation was a substantial or motivating factor for the adverse employment action." <u>Lamboy-Ortíz v. Ortíz-Vélez</u>, 630

F.3d 228, 239 (1st Cir. 2010); Martínez Vélez v. Rey Hernández, 506 F.3d 32, 39 (1st Cir. 2007).   Once the plaintiff clears this hurdle, the defendant may then rebut that showing with what is commonly referred to as the *Mt. Healthy* defense.  They must prove, by a preponderance of the evidence, that "the governmental agency would have taken the same action against the employee even in the absence of the protected conduct." Díaz-Bigio v. Santini, 652 F.3d 45, 52 (1st Cir. 2011) (*quoting* Guilloty Perez v. Pierluisi, 339 F.3d 43, 51 (1st Cir. 2003)) (internal quotation marks omitted).

As an initial matter, it is important to note that "circumstantial evidence alone can support a finding of political discrimination." Anthony v. Sundlun, 952 F.2d 603, 605 (1st Cir. 1991). "[A] plaintiff is not required to produce 'smoking gun' evidence of an employer's impermissible motive to defeat a motion for summary judgment." Welch, 542 F.3d at 940 Padilla-García v. Rodríguez, 212 F.3d 69, 73 (1st Cir. 2000) (emphasizing that the protected conduct need only be a factor in the employment decision, not the motivating factor).  This showing, however, requires more than merely "juxtaposing a protected characteristic-someone else's politics-with the fact that Plaintiff was treated unfairly." Padilla-García, 212 F.3d at 74.  With these items in mind, the Court analyzes these factors in turn.

### 1.   Opposing Political Affiliations.

Although little evidence has been presented regarding this issue, the Court will assume it is true for purposes of this motion, as no party disputes that Governor Fortuño was a member of the NPP or that Secretary Rivera was a high-ranking official in an NPP administration.  And "[i]t is no secret that political leaders most often choose political allies

to fill important policymaking positions." Grajales v. P.R. Ports Auth., 682 F.3d 40, 47 (1st Cir. 2012).  It is therefore reasonable to infer that Rivera and Román were affiliated with the NPP during the relevant period. See, Id. at 47–48 (reasoning that "a plausible inference can be drawn that the plaintiff, who was named to a prestigious trust position by a PDP hierarch under a PDP administration, was a member of the PDP," and remarking that a court is not required "to blind itself to what is obvious").

## 2.     Knowledge of Plaintiff's Political Affiliation.

The Court finds Plaintiffs have failed to establish the second prong of this test.  It is uncontested, and Plaintiffs so admitted, that Defendants Rivera and Román did not know Plaintiffs' political affiliation, and had never spoken to them about politics.  Co-Defendant Rivera does not even know who three (3) of the Plaintiffs are.  See Uncontested Fact nos. 68-70, 92-95, 109-110, 125-127, 137-128, and 140, *supra*.

Unable to deny that Defendants did not know Plaintiffs' political affiliation, and in an attempt to rebut these claims, Plaintiffs proffer that the Department of Education is a "highly politicized agency" and that while admitting Defendants had not openly asked about Plaintiffs' political affiliations, they aver that it was "not necessary to ask about [Plaintiffs' political] affiliation" because "it was known".  See, Plaintiffs' Opposition to Defendants' facts Nos. 137-139.  Plaintiffs are mistaken. This is precisely what the Court must analyze as part of the *prima facie* case and what they must prove in order to surpass this hurdle.

In analyzing the evidence proffered by Plaintiffs, the First Circuit has held that, although a highly charged political atmosphere alone cannot support an inference of discriminatory animus, when coupled with "the fact that plaintiffs and defendants are of

competing political persuasions, may be probative of discriminatory animus." <u>Rodríguez-Ríos v. Cordero</u>, 138 F.3d 22, 24 (1st Cir. 1998).  Nevertheless, political discrimination claims always require "that defendants have ***knowledge*** of the plaintiffs['] political affiliation." (Emphasis added) <u>Martínez-Báez v. Rey-Hernández</u>, 394 F.Supp.2d 428, 434 (D. Puerto Rico 2005); <u>Hatfield-Bermúdez v. Aldanondo-Rivera</u>, 496 F.3d 51, 61-62 (1st Cir. 2007).

Plaintiffs' argument that Defendants need not know Plaintiff's political affiliation because it was obvious is "conclusory and, therefore, cannot be considered." <u>Jiménez-González v. Alvarez-Rubio</u>, 683 F.Supp.2d 177, 183 (D. Puerto Rico, 2010).  Besides this self-serving statement, Plaintiffs cannot demonstrate otherwise that Defendants were aware of their political affiliation. In fact, they all expressly admit that Defendants were not aware of their political affiliation.[8]  Plaintiffs then vaguely address the fact that Defendant Román sometimes spoke to some Plaintiffs about politics, yet this proves nothing.  They could have spoken about a number of political issues that did not necessarily involve knowledge of Plaintiffs' political affiliation.

Defendants have even established that co-Defendant Rivera had appointed some PDP members to trust positions.  <u>See</u>, Uncontested Fact no. 54, *supra*.  Again, while admitting, this fact, Plaintiffs then proffer that "this demonstrates that he had knowledge of who were members of the PDP".  While the fact that Rivera appointed two (2) PDP members may establish that he had knowledge that these two (2) particular employees were

---

[8] <u>See</u>, Uncontested Fact nos.  68-70, 92-95, 109-110, 125-127, 137-128, and 140, *supra*.

PDP, it cannot serve to establish that he knew of anyone else's political affiliation, or, for that matter, Plaintiffs'.

Succinctly put, at this stage of the game, Plaintiffs must proffer evidence to enable a reasonable jury to find that the Defendants knew their political affiliation.  They have proffered nothing except their self-serving word.  It should be noted that this Court has expressly rejected the allegation that the knowledge of someone's political affiliation can be "passed" simply because it is something widely known in the workplace.  Jiménez-González, 683 F.Supp.2d at 183-84; see also, López-Rosado v. Molina-Rodríguez, 2012 WL 4681956 (D. Puerto Rico, 2012).   As it is, this is insufficient to evidence that Defendants had knowledge of Plaintiffs' party affiliation.

Indeed, with more evidence before them that what Plaintiffs have proffered in this case, other courts have held it is insufficient to establish that one person knew of another's political affiliation.  See, Hatfield-Bermúdez, 496 F.3d at 62 ("The fact that the plaintiffs were municipal employees under the previous administration, participated in political rallies, worked at electoral colleges, and were well-known supporter of the administration's political party does not constitute evidence of knowledge of their political affiliation); Román v. Delgado-Altieri, 390 F.Supp.2d 94, 102-03 (D. Puerto Rico, 2005) (holding that "a plaintiff cannot prove that the defendant had knowledge of his political affiliation merely through: testimony of having been seen, or, for that matter, met during routine campaign activity participation, having been visited by the now incumbent while said defendant was a candidate to the position he now holds, by having held a trust/confidential/policymaking position in the outgoing administration, by having political propaganda adhered to

plaintiff's car and/or house, or through knowledge of third parties"); González-De Blasini v. Family Dep't, 377 F.3d 81, 86 (1st Cir. 2004) (Alleging that a plaintiff is a well known supporter of a different political party by itself is not sufficient to show that a challenged employment action was premised upon political affiliation); Rodríguez-Díaz v. Marrero-Recio, 2010 WL 4117214 (D. Puerto Rico, Oct. 20, 2010)( "A plaintiff does not meet the burden of showing simply by alleging that defendants must have been aware of his political affiliation simply because he is a well-known supporter of that party, has political propaganda on his house or car, held trust positions when that party was in power, or because he suffered an adverse employment action shortly after a change in administration.")

On these facts, the Court cannot find that Plaintiffs have established that Defendants knew of their political affiliation.

### 3. Adverse Employment Action.

The Court also finds that Plaintiffs have failed to evidence that an adverse employment action occurred. For First Amendment purposes, an adverse employment action occurs "if those actions, objectively evaluated, would place substantial pressure on even one of thick skin to conform to the prevailing political view." Rodríguez-García v. Miranda-Marín, 610 F.3d 756, 766 (1st Cir. 2010) (internal citations omitted). The following have been held to constitute "adverse employment actions", discharging or demoting an employee, denying promotions and transfers, and failing to recall a public employee after layoffs (Id.); a "substantial alteration in an employee's job responsibilities" (Bergeron v. Cabral, 560 F.3d 1, 8 (1st Cir. 2009); a denial of "special benefits and

assignments" that normally come with a job  (Id.);   when the plaintiff is confronted with "a work situation unreasonably inferior to the norm for the position." (Rodríguez-García, 610 F.3d at 766); "Informal harassment, as opposed to formal employment actions ... can be the basis for the [F]irst [A]mendment claims if the motive was political discrimination; but only if the acts are 'sufficiently severe to cause reasonably hardy individuals to compromise their political beliefs and associations in favor of the prevailing party.'" (Cordero-Suárez v. Rodríguez, 689 F.3d 77, 82 (1st Cir. 2012)); "lost access to telephone and photocopier, poorer office accoutrements, worse hours" are also considered when determining whether an adverse action occurred. (Carrasquillo-González v. Sagardía de Jesús, 723 F.Supp.2d 428, 435 (D. Puerto Rico, 2010).

Under "short of dismissal" actions, Plaintiffs must satisfy a two (2) prong test: that is, they must show that the removal of their duties was motivated by their political affiliation, and that the challenged actions resulted in a work environment "unreasonably inferior" to the norm for the position.  Román v. Delgado Altieri, 390 F.Supp.2d 94, 104 (D. Puerto Rico 2005).   In deciding whether a challenged employment action resulting in unreasonably inferior conditions has occurred, "[a]ctual functions of the job, not titles, control, and an official description of job functions is a presumptively reliable basis for determining those functions." López-Quiñones v. P.R. Nat'l. Guard, 526 F.3d at 26 (1st Cir. 2008).

Before analyzing the facts before it, the Court notes again that the reorganization, which reduced the school districts from eighty-two (82) to twenty-eight (28), was island

wide; districts were shrunk and consolidated, across the board.  It is against this backdrop that the Court analyzes the claims before it.

At the outset, the Court finds that Plaintiffs cannot prove that the removal (if any) of their duties was motivated by their political affiliation since they have expressly admitted that Defendants did not know of it.  As to the challenged actions themselves, Plaintiff Rosa was reinstated to her previous position, but in Yabucoa, instead of San Lorenzo.  She specifically admitted the following facts: a) during the 2009-10 school year while she was performing the duties of director at the María T. Delgado School, nobody occupied her previous position and nobody performed the functions of her previous position of Auxiliary Superintendent Title I; b) she had no change in salary; c) she performed all the functions of School Director as indicated in form DE-16 during her administrative detail; d) once reinstated to her career position of Auxiliary Superintendent Title I, she was sent to Yabucoa, which she alleges was a hardship for her as it was far away from her home [9], but she requested (and was granted) a transfer to Gurabo, where she resided, just two (2) months later [10]; e) since her reinstatement, she occupied her position and performed all the duties pertaining it up until her retirement; g) while she was at the District of Yabucoa as

---

[9] Which a cursory review of the Puerto Rico map shows to be the town immediately next to San Lorenzo, where she was previously working before the detail.  Therefore, Plaintiff's residence in Gurabo was located one (1) town away from her previous assignment in San Lorenzo, and two (2) towns away from where she was reinstated in Yabucoa, a total of 13.72 miles away. It is difficult to label this distance "a hardship" and Plaintiff's have proffered no reason why this was a hardship besides the distance, which, as the Court has found, is minimal.

[10] Under our precedent, once the officials have been notified of the adverse employment actions, "it is reasonable to infer that the failure to take" affirmative steps necessary to resolve the problem "constitutes a choice" not to act. Lipsett v. University of Puerto Rico, 864 F.2d 881, 902 (1st Cir. 1988).  Steps were taken to address and act on Rosa's transfer just two (2) months after it was sought, and she was sent to Gurabo, her home, and which is the town next to San Lorenzo, where she was originally stationed.

Auxiliary Superintendent, she performed all her functions except for function no. 7 of the DE-16 Position Description for her position.

Plaintiff Arroyo alleges that she was somehow stripped of functions when she was reinstated to her position as School Superintendent in Gurabo after the detail ended.  Yet, the facts, as accepted by her, reveal the following: a) during the 2010-11 school year, she was a leader in the newly created Technical Assistance Unit; b) while there, she developed tools and processes which were not solely for the benefit of  Gurabo's District but were also shared with other twenty-seven (27) districts; c) after the reorganization of the school districts, she was in charge of five (5) Auxiliary Superintendents (Technical Assistants) and she supervised and evaluated the Auxiliaries, among other duties; d) she visited school directors and supervised her Auxiliary Superintendents, making sure that they carried out their assigned duties. The Court notes her salary also remained unchanged.  Although she challenges the duties in her new position as being "different", as her new position was a newly created one, it is logical that the responsibilities would differ.

In the case of Plaintiffs Rodríguez and Del Valle, they argue that they were "forced" to tender a letter of resignation to an inferior position (that of School Director), and that their reinstatement should have been to the position they resigned from (Auxiliary Superintendent).  As an initial matter, the Court must again note that these actions occurred in October, 2009.  Besides the fact that the acts are time-barred, Defendants cannot be held responsible for these actions as they had not yet been appointed to the Secretariat.

<u>Luis Rodríguez Ramos, et al. v. Department of Education, et al.</u>
Civil No. 11-1653 (CVR)
Opinion and Order
Page 81

Moving on to the reinstatements themselves, Defendants aver that, since both Plaintiffs Del Valle and Rodríguez were occupying positions whose probationary period had not yet ended at the time they tendered their letters of resignation, that their reinstatement as School Directors at the time the detail ended was proper. The Court agrees with Defendants. Plaintiffs have not shown that their probationary period – which runs for two (2) years – had ended by the time they submitted their voluntary demotions. On the contrary, the record shows that it had not.

The Department of Education Regulation for Government Employees, No. 6743, states that reentry into the service is the right of a career service employee who voluntarily resigns or is laid off for lack of funds, elimination of positions, programs or departments. <u>See</u>, Docket No. 131-4, Section X. That person is to be considered for employment in the position or positions *he last performed with permanent status* (emphasis added). Personnel who do not approve the probationary period and have been employed in teaching position with permanent status in another category will be entitled to be *reinstated in a position in the same category that they had last occupied in a permanent basis or in another position for which requirements are analogous.* <u>Id.</u>, at Sec. VI (emphasis added). Before their employment as Auxiliary Director, both of these Plaintiffs had been School Directors. <u>See.</u> D. Exhibits 64 and 74. Plaintiffs became probationary employees on September 3, 2008 (Del Valle) and August 27, 2008 (Rodríguez). Their "demotion" letters were submitted on October 6, 2009 (Del Valle) and October 7, 2009 (Rodríguez), a little over a year after they began their probationary status, and therefore did not reach the two (2) year mark. Even if the Court were to consider the additional year they spent on

<u>Luis Rodríguez Ramos, et al. v. Department of Education, et al.</u>
Civil No. 11-1653 (CVR)
Opinion and Order
Page 82

administrative detail towards the probationary period computation, the detail ended on June, 30, 2010. Both Plaintiffs fall short of reaching the two (2) year mark. Since they did not finish their probationary period, both Plaintiffs were simply reinstated to that position of School Director, the last position they held with permanent status (which incidentally, was the position they requested to be "demoted" to) as required under the regulations. The Court finds no error with this.

Additionally, the Court also notices that, although these two (2) Plaintiffs aver that this was a demotion, when they were reinstated as School Directors after the leave ended, they both had a payment differential that ultimately rendered their salaries higher than when they were Auxiliary Superintendents. <u>See</u>, D. Exhibits 67 and 77. Defendant Rodríguez' salary as Auxiliary was $2,775 and as School Director was $3,025. Plaintiff Del Valle's salary as Auxiliary was $2,860 and as School Director was $3,110. The Court cannot see the hardship here.

Plaintiffs Del Valle and Rodríguez further aver they went to numerous interviews for the position they previously held (Auxiliary Superintendent) and were not selected, and therefore, this process was somehow charged with political animus. Unfortunately for Plaintiffs, they have nothing but their word to stand for this proposition, which as this stage, is insufficient. Furthermore, the Court has examined the applicable regulations. They state that the certification of the employees will be established strictly along seniority. Even making all inferences in their favor, Plaintiffs have not even hinted that they were senior to any of the chosen employees. They have opted instead to attempt to create an issue of fact alleging that: 1) they were qualified, but not chosen for the positions; 2) that they had

to compete for positions they had once held; and 3) that the scoring they received was not the "correct outcome, given the years of experience", because that they had "held the position before".  See, *e.g.*, Plaintiff's Opposition to Defendants' facts nos. 195-197. Defendants have set forth facts that have shown that: Plaintiffs qualified for some positions and not others (and were even absent to some interviews); and that for some of the ones they qualified for, the were selected as a final possible candidate but were ultimately not chosen.

As previously discussed, Plaintiffs specifically admitted that none of the Defendants knew of their political affiliation.  It is also undisputed that co-Defendant Rivera did not participate in the interview or the decision making process of the eligible candidates, and that he only met Plaintiff Arroyo, whose political affiliation he did not know.  Regarding Plaintiffs Del Valle and Rodríguez' interviews, it is uncontested that the interviewing committee itself was comprised of three (3) employees, which on several occasions, co-Defendant Román was a member of, who would then recommend three (3) candidates to the Secretary for his choosing.   She did not participate in many of the interviews.

On these facts, the Court can find no political animus on these actions, and Plaintiffs have not proffered any evidence to sustain their allegations that these actions (in not qualifying them and/or hiring them) were motivated by political animus.  On the contrary, both Plaintiffs were qualified on several occasions, and at least once, Plaintiff Del Valle was actually certified as one of the top three (3) candidates when he had received the lowest score of all certified candidates, conduct he now takes issue with regarding some of the other candidates.  See, Uncontested Fact nos. 151 and 153, *supra*, and D. Exhibit 24.

Plaintiffs cannot have their cake and eat it too – what is good for the goose is good for the gander.  Plaintiffs have not proffered evidence to establish any discriminatory animus or hardship on these facts, while Defendants have established that even candidates with lower marks (like Plaintiff Del Valle) were sometimes recommended to the Secretary as final candidates.

Plaintiff Del Valle also alleged that discriminatory actions were taken against him because he received a letter of intention to commence a disciplinary proceeding against him for situations in his school, yet this proceeding was closed without any negative action having been taken against this Plaintiff by the Department.  Furthermore, it is uncontested that neither co-Defendant Rivera nor Román were in charge of implementing, reporting, opening  or in the subsequent follow-ups for disciplinary cases that were actually opened.

Under these facts, the Court is hard-pressed to find that an adverse employment, politically motivated action occurred towards any of the Plaintiffs.

### 4.    Political Affiliation as a Substantial or Motivating Factor for the Adverse Employment Action.

The Court found that Plaintiffs failed to meet the adverse employment action prong. It further finds that Plaintiffs also fail this prong of the analysis, for the reasons stated in the second prong, namely, Plaintiffs have been unable to establish that Defendants knew of their political affiliation.  Therefore, it is difficult to see how they can establish that the Defendants' actions taken towards them were motivated by political animus. Nieves-Hernández v. Puerto Rico Elec. Power Auth., 2006 WL 1704572 *3 (D. Puerto Rico, June 16, 2006) ("For political affiliation to be a motivating factor behind an adverse

employment action, those responsible for the deprivation of constitutional rights must have had knowledge of the plaintiff's political affiliation"). Furthermore, Plaintiffs have expressly admitted that Defendants did not know their political affiliation.[11]

The political harassment claims, as few as they are, suffer the same fate, for the same reasons, and because it is uncontested that neither of the Defendants was in charge of the monitoring, which is the thrust of the harassment claims. The Court need go no further.

Having found that Plaintiffs did not meet their *prima facie* burden, the Court does not reach the analysis of the <u>Mt. Healthy</u> defense. Plaintiffs' First Amendment claims are therefore DISMISSED WITH PREJUDICE.

### C. Equal Protection Claims.

The First Circuit has stated that "[a]n equal protection claim alleging political discrimination merely restates a First Amendment political discrimination claim and, as we have said repeatedly, should have been considered under the First Amendment." <u>See</u>, <u>Morales-Santiago v. Hernández-Pérez</u>, 488 F.3d 465, 471 (1st Cir.2007); <u>see</u> <u>also</u> <u>Uphoff Figueroa v. Alejandro</u>, 597 F.3d 423, 426, 430 n. 8 (1st Cir. 2010) ("Once again we remind litigants that political discrimination [and retaliation] claims under the First Amendment cannot be restated as claims under the Equal Protection Clause"), and <u>Pagán v. Calderón</u>, 448 F.3d 16, 36 (1st Cir. 2006) ("appellant's equal protection claim, which was premised

---

[11] In their statement of uncontested facts, Defendants aver and produce sworn affidavits that they did not know Plaintiffs' political affiliation. Plaintiff admits many of these facts, yet adds that it was "not necessary to know" the political affiliation. This issue was already discussed in section B.2, *supra* , and for the reasons already explained, renders the statements uncontested. <u>See</u>, Loc. R. 56(e); <u>Alsina-Ortiz v. Laboy</u>, 400 F.3d,77, 80 (1st Cir. 2005)(*citing* <u>Cosme-Rosado v. Serrano Rodríguez</u>, 360 F.3d 42 46 (1st Cir. 2004).

on allegations of political discrimination, flounders, as it is a mere restatement of her failed First Amendment claim").

In the case at bar, Plaintiff's equal protection allegations as such, are non-existent. In their complaint, Plaintiffs aver that they have been discriminatorily treated and that adverse employment actions have been taken against them by Defendants since the 2009 change in administration, all due to their political affiliation with the PDP. These are clearly First Amendment claims, and Plaintiffs have presented no other claims of selective or disparate treatment via-a-vis other similar situated individuals on the basis of race or religion. See, Docket No. 1, ¶ 130, p. 24.  Therefore, to the extent that Plaintiffs' equal protection claim is merely a disguised First Amendment claim,  it will be treated as such. See, Néstor Colón Medina & Sucesores, Inc. v. Custodio, 964 F.2d 32, 45 (1st Cir.1992) (declining to apply equal protection analysis in light of the overlap between plaintiffs' First Amendment and equal protection claims).

Accordingly, the equal protection claims are therefore DISMISSED WITH PREJUDICE.

**D.    Due Process Claims.**

Defendants also argue they are entitled to summary judgment on Plaintiffs Del Valle and Rodríguez' due process claims. (Docket No. 34 at pp. 30–34).  As previously discussed, the main thrust of these two (2) Plaintiffs' arguments is that they were "removed" from their positions as Auxiliary Superintendent and placed in the position of School Director, and that this somehow violated their due process rights.

Again, the Court must mention that any acts that pertain to the administrative are time-barred, as Plaintiffs failed to sue within the one (1) year statute of limitations.  If Plaintiffs' allegations refer to the reinstatement to the School Director positions after the detail ended, Plaintiffs' claims must also fail.

A plaintiff can be said to have evidenced a due process violation when he or she can prove he/she had property interest as defined by state law and that the defendants, acting under color of state law, deprived them of that property interest without constitutionally adequate process.  See, Logan v. Zimmerman Brush Co., 455 U.S. 422, 428, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982).  Puerto Rico creates a property interest in continued career employment. Soto-González v. Rey-Hernández, 310 F.Supp.2d 418, 425 (D. Puerto Rico 2004) (citing Kauffman v. P.R. Tel. Co., 841 F.2d 1169, 1173 (1st Cir. 1988)).

Due process requires that a deprivation of property "be preceded by notice and opportunity for hearing appropriate to the nature of the case." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 542, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985).  An exception to the due process requirement that an individual is entitled to some kind of prior hearing before having protected interest taken away is the "reorganization exception," which Defendants allege applies here.  In that case, when a reorganization or cost-cutting measure results in the dismissal of public employees, employees are not entitled to a pre-termination hearing as long as the reorganization or cost-cutting measure is not merely pre-textual.  United Auto. v. Fortuño, 677 F.Supp.2d 530 (D. Puerto Rico 2009).  The Court finds this exception is inapplicable here, as it applies only when an employee has been dismissed, and no such actions has occurred  here.

Under Puerto Rico law, however, the substantive requirements of the probationary period must have been met in order for a probationary employee to become a career employee.  See P.R. Laws Ann. tit. 3 § 1462b(3)(g) ("Upon satisfactorily completing the probation period, the employee shall become a regular career employee") ; Zambrana v. González, 145 D.P.R. 616, 632-33 (1998) ("The satisfactory completion of the probationary period is one of the most important stages of the recruiting process"); Gierbolini Colón v. Aponte Roque, 666 F.Supp. 334, 337 (D. Puerto Rico 1987) ("[plaintiff] was a probationary employee until the last evaluation on that probation was finished and a decision on whether he satisfactorily completed the period was made.").

Thus, given the law's focus on evaluation and satisfactory completion of the probationary period, Plaintiffs Del Valle and Rodríguez have not shown that they were regular career employees.  On the contrary,  the record evidences they had not met the two (2) year probationary period time limit before they tendered their demotion letter, which Defendants have established was necessary in order to avoid layoffs that were part of a comprehensive layoff plan fostered by the administration (which the Court takes judicial notice of the fact that it was judicially challenged on many occasions, and with few exceptions, upheld in the courts).   Since the probationary period had not ended, Plaintiffs Del Valle and Rodríguez cannot be said to have had a protected property interest in their positions as Auxiliary Superintendents. See, e.g., Febus-Cruz v. Saurí-Santiago, 652 F.Supp.2d 140 (D. Puerto Rico, 2009)(Dismissing procedural due process claims because as a probationary employee, plaintiff  had no property right to continued employment and thus, no right to due process right to notice and a pre-termination hearing).

<u>Luis Rodríguez Ramos, et al. v. Department of Education, et al.</u>
Civil No. 11-1653 (CVR)
Opinion and Order
Page 89

Plaintiffs also seem to raise, for the first time at summary judgment, a substantive due process violation, which was not alleged in the complaint.  It has been well established that a claimant cannot bring forth a claim at the summary judgment stage for the first time.  <u>See,</u> <u>Gilmour v. Gates, McDonald & Co.</u>, 382 F.3d 1312, 1315 (11th Cir. 2004) (holding that a plaintiff could not raise a new claim in response to a summary judgment motion); <u>see also</u>, *generally*, 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2723 (3d ed. Supp. 2005).  To be sure, allowing Plaintiffs to raise these new issue at this late stage would subject Defendants to unfair surprise. <u>See, Guiffre v. Local Lodge No. 1124,</u> No. 90-3540, 1991 WL 135576, at *5 (6th Cir., July 24, 1991) (unpublished) (refusing to hear claims raised for the first time in opposition to summary judgment because, "[h]aving received no notice of them, the defendants had no opportunity to investigate them when they conducted their own discovery"); <u>EEOC v. J.H. Routh Packing Co.</u>, 246 F.3d 850, 854 (6th Cir. 2001) (stating that even under the liberal notice-pleading regime, the Federal Rules of Civil Procedure still require "that the complaint give the defendant fair notice of the claim and its supporting facts").  Therefore, Plaintiffs' substantive due process at this late stage cannot lie.

For the aforementioned reasons, Plaintiffs Rodríguez and Del Valle's procedural and substantive due process claims are DISMISSED WITH PREJUDICE.

### E.    Qualified Immunity.

In light of the above findings, there is no need to discuss whether Defendants are entitled to qualified immunity.

**F.     State Law Claims.**

Plaintiffs also bring forth claims under the Puerto Rico Constitution; the Public Service Law, No. 184 of August 3, 2004, as amended; and Articles 1802 and 1803 of the Puerto Rico Civil Code, P.R. Laws Ann., tit. 31, §§ 5142 and 5142.

Having dismissed the federal causes of action, this Court declines to exercise supplemental jurisdiction over the state-law claims in the present case.  As such, the state law claims are DISMISSED WITHOUT PREJUDICE.

**CONCLUSION**

For the reasons stated above, the Court hereby GRANTS Defendants' Motion for Summary Judgment (Docket No. 121).  Accordingly, the federal claims brought against co-Defendants Jesús Rivera Sánchez and Sonia Dalila Román are hereby DISMISSED WITH PREJUDICE.  In addition, all state law claims against the named individual Defendants are DISMISSED WITHOUT PREJUDICE.

Judgment will be entered accordingly.

IT IS SO ORDERED.

In San Juan, Puerto Rico, on this 30th day of September of 2014.

S/CAMILLE L. VELEZ-RIVE
CAMILLE L. VELEZ RIVE
UNITED STATES MAGISTRATE JUDGE